## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

Kathleen Kervin                 :           CIVIL ACTION
                             :
           v.              :
                             :
The 3M Company (f/k/a Minnesota Mining and    :         NO.
Manufacturing Company), et al.           :

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.      ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
     and Human Services denying plaintiff Social Security Benefits.      ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
     exposure to asbestos.      ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
     commonly referred to as complex and that need special or intense management by
     the court. (See reverse side of this form for a detailed explanation of special
     management cases.)      (X)

(f) Standard Management – Cases that do not fall into any one of the other tracks.      ( )

| October 9, 2018 | | Chemguard, Inc. |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 278-2555 | (215) 278-2594 | eleffler@shb.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Kathleen Kervin

**DEFENDANTS**

The 3M Company (f/k/a Minnesota Mining and Manufacturing Company), et al. (see attached list of all parties and counsel)

**(b)** County of Residence of First Listed Plaintiff   Bucks Co., PA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Ramsey Co., MN
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attached list of all counsel and parties

Attorneys *(If Known)*

See attached list of all counsel and parties

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government Plaintiff

☐ 3   Federal Question *(U.S. Government Not a Party)*

☐ 2   U.S. Government Defendant

☒ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product   Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability   ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &   Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander   Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'   Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability   ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine   Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product   Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability   **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability   ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal   Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury   ☒ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury -   Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/   Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations   ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment   **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other   ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education   ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1   Original Proceeding

☒ 2   Removed from State Court

☐ 3   Remanded from Appellate Court

☐ 4   Reinstated or Reopened

☐ 5   Transferred from Another District *(specify)*

☐ 6   Multidistrict Litigation - Transfer

☐ 8   Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Sections 1332, 1441, 1446, and 1453

Brief description of cause:
Plaintiff alleges injury from fire fighting product ordered by U.S. armed forces

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
Excess of $75,000.00

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE   Petrese Tucker

DOCKET NUMBER   See attached list

DATE
10/09/2018

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #              AMOUNT              APPLYING IFP              JUDGE              MAG. JUDGE

Attachment to Civil Cover Sheet - *Kervin v. The 3M Company, et al.*
LIST OF ALL COUNSEL AND PARTIES

**Plaintiff Kathleen Kervin's Counsel:**
Mark R. Cuker
Cuker Law Firm, LLC
2005 Market Street, Suite 1120
Philadelphia, PA 19103

W. Steven Berman
Napoli Shkolnik PLLC
1 Greentree Centre, Suite 201
10,000 Lincoln Drive
Marlton, NJ 08053

**Counsel for Served Defendants and Defendants Not Yet Served:**
Joseph H. Blum
Erin P. Loucks
Shook, Hardy & Bacon LLP
Two Commerce Square
2001 Market Street, Suite 3000
Philadelphia, PA 19103
*Counsel for Defendant, Chemguard, Inc.*

Keith E. Smith
Greenberg Traurig, LLC
2700 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
*Counsel for Defendant National Foam, Inc. (a/k/a Chubb National Foam)*

The 3M Company (f/k/a Minnesota Mining and Manufacturing Co.)
3M Center
St. Paul, MN 55144

Angus Fire (f/k/a Angus International)
141 Junny Road
Angier, NC 27501

The Ansul Company (a/k/a Ansul Chemical Company; a/k/a The Ansul Company a/k/a Ansul Fire Protection)
One Stanton Street
Marinette, WI 54143

Buckeye Fire Equipment Company
10 Kings Road
Kings Mountain, NC 28086

Attachment to Civil Cover Sheet - *Kervin v. The 3M Company, et al.*
LIST OF ALL RELATED CASES

1.  *Bates, et al. v. The 3M Company, et al.*
    2:16-cv-4961-PBT

2.  *Grande, et al. v. The 3M Company, et al.*
    2:16-cv-5380-PBT

3.  *Yockey, et al. v. The 3M Company, et al.*
    2:16-cv-5553-PBT

4.  *Fearnley v. The 3M Company, et al.*
    2:16-cv-6416-PBT

    (The first four cases have been consolidated under *Bates*)

5.  *Menkes, et al. v. The 3M Company, et al.*
    2:17-cv-573-PBT

6.  *Zysk, et al. v. The 3M Company, et al.*
    2:18-cv-2036-PBT

7.  *Gillen v. The 3M Company, et al.*
    2:18-cv-2037-PBT

8.  *Voelker, et al. v. The 3M Company, et al.*
    2:18-cv-2038-PBT

9.  *Gentles v. The 3M Company, et al.*
    2:18-cv-2039-PBT

10. *Saturno v. The 3M Company, et al.*
    2:18-cv-2040-PBT

11. *Grande v. The 3M Company, et al.*
    2:18-cv-2041-PBT

12. *Burbridge v. The 3M Company, et al.*
    2:18-cv-2043-PBT

13. *Eynon v. The 3M Company, et al.*
    2:18-cv-3387-PBT

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ c/o Cuker Law Firm, 2005 Market Street, Suit 1120, Philadelphia, PA 19103 _____

Address of Defendant: _____ c/o Shook, Hardy & Bacon, 2001 Market Street, Suite 3000, Philadelphia, PA 19103 _____

Place of Accident, Incident or Transaction: _____ Warminster, PA _____

---

*RELATED CASE, IF ANY:*

Case Number: _____ See attached list _____   Judge: _____ Petrese Tucker _____   Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes [✔]   No [ ]

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes [✔]   No [ ]

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes [ ]   No [✔]

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes [ ]   No [✔]

I certify that, to my knowledge, the within case [■] is / [ ] is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 10/09/2018 _____   _____ Attorney-at-Law / Pro Se Plaintiff   204507 _____ Attorney I.D. # (if applicable)

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

- [ ] 1. Indemnity Contract, Marine Contract, and All Other Contracts
- [ ] 2. FELA
- [ ] 3. Jones Act-Personal Injury
- [ ] 4. Antitrust
- [ ] 5. Patent
- [ ] 6. Labor-Management Relations
- [ ] 7. Civil Rights
- [ ] 8. Habeas Corpus
- [ ] 9. Securities Act(s) Cases
- [ ] 10. Social Security Review Cases
- [ ] 11. All other Federal Question Cases
  *(Please specify):* _____

**B.** *Diversity Jurisdiction Cases:*

- [ ] 1. Insurance Contract and Other Contracts
- [ ] 2. Airplane Personal Injury
- [ ] 3. Assault, Defamation
- [ ] 4. Marine Personal Injury
- [ ] 5. Motor Vehicle Personal Injury
- [ ] 6. Other Personal Injury *(Please specify):* _____
- [✔] 7. Products Liability
- [ ] 8. Products Liability – Asbestos
- [ ] 9. All other Diversity Cases
  *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Erin Loucks _____, counsel of record *or* pro se plaintiff, do hereby certify:

- [✔] Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

- [ ] Relief other than monetary damages is sought.

DATE: 10/09/2018 _____   _____ Attorney-at-Law / Pro Se Plaintiff   204507 _____ Attorney I.D. # (if applicable)

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Attachment to Designation Form - *Kervin v. The 3M Company, et al.*
LIST OF ALL RELATED CASES

1.  *Bates, et al. v. The 3M Company, et al.*
    2:16-cv-4961-PBT

2.  *Grande, et al. v. The 3M Company, et al.*
    2:16-cv-5380-PBT

3.  *Yockey, et al. v. The 3M Company, et al.*
    2:16-cv-5553-PBT

4.  *Fearnley v. The 3M Company, et al.*
    2:16-cv-6416-PBT

    (The first four cases have been consolidated under *Bates*)

5.  *Menkes, et al. v. The 3M Company, et al.*
    2:17-cv-573-PBT

6.  *Zysk, et al. v. The 3M Company, et al.*
    2:18-cv-2036-PBT

7.  *Gillen v. The 3M Company, et al.*
    2:18-cv-2037-PBT

8.  *Voelker, et al. v. The 3M Company, et al.*
    2:18-cv-2038-PBT

9.  *Gentles v. The 3M Company, et al.*
    2:18-cv-2039-PBT

10. *Saturno v. The 3M Company, et al.*
    2:18-cv-2040-PBT

11. *Grande v. The 3M Company, et al.*
    2:18-cv-2041-PBT

12. *Burbridge v. The 3M Company, et al.*
    2:18-cv-2043-PBT

13. *Eynon v. The 3M Company, et al.*
    2:18-cv-3387-PBT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

KATHLEEN KERVIN

          *Plaintiff,*

    v.

3M COMPANY (f/k/a Minnesota Mining and
Manufacturing, Co), ANGUS FIRE (f/k/a Angus
International), ANSUL (a/k/a Ansul Chemical
Company; a/k/a The Ansul Company a/k/a Ansul
Fire Protection), BUCKEYE FIRE EQUIPMENT
COMPANY, CHEMGUARD, INC., and
NATIONAL FOAM, INC. (a/k/a Chubb National
Foam),

          *Defendants.*

Civil Action No. _____

NOTICE OF REMOVAL

JURY TRIAL DEMANDED

**DEFENDANT CHEMGUARD, INC.'S NOTICE OF REMOVAL**

TO:    COURT OF COMMON PLEAS OF MONTGOMERY COUNTY
        Office of the Prothonotary
        Norristown, PA 19404

        Mark R. Cuker
        Cuker Law Firm, LLC
        2005 Market Street, Suite 1120
        Philadelphia, PA 19103
        *Counsel for Plaintiff*

        W. Steven Berman
        Napoli Shkolnik PLLC
        1 Greentree Centre, Suite 201
        10,000 Lincoln Drive
        Marlton, NJ 08053
        *Counsel for Plaintiff*

        Keith E. Smith
        Greenberg Traurig, LLC
        2700 Two Commerce Square
        2001 Market Street
        Philadelphia, PA 19103
        *Counsel for Defendant National Foam, Inc.*

1

Defendant Chemguard, Inc. ("Chemguard"), by and through its undersigned counsel, hereby gives notice of removal of this action, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, to the United States District Court for the Eastern District of Pennsylvania. As grounds for removal, Chemguard states as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff seeks to hold Chemguard and other defendants liable based on their alleged conduct in designing, manufacturing, and selling firefighting chemical agents to the United States military and others pursuant to government contracts and in accordance with the military's rigorous specifications. This action is removable to federal court based on diversity jurisdiction under 28 U.S.C. § 1441(b). Further, Chemguard intends to assert the federal "government contractor" defense in response to Plaintiff's claims. Under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), Chemguard is entitled to remove this action in order to have its federal defense adjudicated in a federal forum.

## I.      STATE COURT PROCEEDINGS

2.      Plaintiff commenced the above-captioned civil action in the Court of Common Pleas of Montgomery County, Pennsylvania by filing a complaint on August 17, 2018 (the "Complaint") against The 3M Company, Angus Fire, Tyco Fire Products LP (incorrectly designated as Ansul), Buckeye Fire Equipment Company, National Foam, Inc., and Chemguard (collectively, "Defendants"). A copy of all process, pleadings, and orders served upon Chemguard filed in the Court of Common Pleas of Montgomery County, Pennsylvania, is attached hereto as Exhibit A.

3.      Plaintiff alleges, *inter alia*, that Defendants manufactured, sold, and/or distributed a defective product, namely aqueous film-forming foams ("AFFF"), which contained allegedly

toxic constituents and to which Plaintiff has allegedly been exposed. Plaintiffs allege that AFFF contains perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA"), as well as related fluorochemicals that can degrade to PFOS or PFOA. *See* Compl. at ¶¶ 4, 7, 9, 11, and 13.

4.     Chemguard was served with the Complaint on September 10, 2018. Chemguard files this Notice of Removal within 30 days from service of the Complaint. Thus, this Notice of Removal is timely filed. *See* 28 U.S.C. § 1446(b)(1).

5.     Chemguard will promptly file a copy of this Notice of Removal with the Prothonotary of the Court of Common Pleas of Montgomery County, Pennsylvania.

6.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 118(a) and 1441(a), because the United States District Court for the Eastern District of Pennsylvania is the federal judicial district and division embracing the Court of Common Pleas of Montgomery County, Pennsylvania, where the action was originally filed.

7.     By filing a Notice of Removal in this matter, Chemguard does not waive the rights of any Defendant to object to service of process, the sufficiency of process, jurisdiction over the person, or venue, and Chemguard specifically reserves the rights of all Defendants to assert any defenses and/or objections to which they may be entitled.

8.     Chemguard reserves the right to amend or supplement this Notice of Removal.

9.     If any question arises as to the propriety of the removal of this action, Chemguard requests the opportunity to present a brief and oral argument in support of removal.

10.     As shown below, this action is removable to federal court based on diversity jurisdiction under 28 U.S.C. § 1332. The action is also removable to federal court based on federal officer jurisdiction under 28 U.S.C. § 1442(a)(1).

3

11.   Although not required (because this action is not removed solely under 28 U.S.C. § 1441(a)), all defendants that have been properly joined and served in this action as of this date join in or consent to the removal of this action to this Court.  Consent of the only defendant that has been served as of the time of filing of this Notice of Removal, National Foam, Inc., is attached hereto as Exhibit B.

## II.   REMOVAL IS PROPER BASED ON DIVERSITY JURISDICTION

12.   This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332. Diversity jurisdiction exists where (1) the amount in controversy exceeds $75,000, exclusive of interests and costs, and (2) the suit is between citizens of different states.

### A.   Complete Diversity of Citizenship Exists

13.   The Complaint alleges that Plaintiff is a citizen of Pennsylvania.  *See* Compl. at ¶ 1.

14.   The Complaint alleges that The 3M Company is incorporated in Delaware and maintains a principal place of business in Minnesota; thus, it is a citizen of Delaware and Minnesota. *See* Compl. at ¶ 3.

15.   The Complaint alleges that Angus Fire maintains corporate headquarters in the United Kingdom and maintains a principal place of business in North Carolina; thus, it is a citizen of North Carolina.  *See* Compl. at ¶ 5. Upon information and belief, the "Angus Fire" entity that plaintiff attempts to identify is "Angus Fire Armour Corporation" which had its MilSpec AFFF product on the government's Qualified Products List ("QPL") maintained by the United States Department of Defense.  The Angus Fire brand and the North Carolina facility was purchased by defendant National Foam in 2013.

4

16.     The Complaint alleges that Ansul is incorporated in Wisconsin and maintains a principal place of business in Wisconsin. *See* Compl. at ¶ 6. The Complaint incorrectly identifies Tyco Fire Products, L.P. ("Tyco") as Ansul. Tyco is a limited partnership formed in Delaware. As a limited partnership, Tyco has the citizenship of each of its general and limited partners; the location of Tyco's principal place of business is legally irrelevant to its citizenship. *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015); *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 347-48 (3d Cir. 2013). Tyco's partners are Central Sprinkler LLC and Fire Products GP Holding LLC. These limited liability companies have the citizenship of their membership, which is as follows: (a) Fire Products GP Holding, LLC is wholly owned by its single member, Central Sprinkler LLC, (b) Central Sprinkler LLC is wholly owned by its single member, Tyco International Management Company, LLC, (c) Tyco International Management Company, LLC is wholly owned by its single member, Tyco Fire & Security US Holdings LLC, (d) Tyco Fire & Security US Holdings LLC is wholly owned by its single member, Tyco Fire & Security (US) Management, Inc. Tyco Fire & Security (US) Management, Inc. is incorporated in Nevada, and its principal place of business is in New Jersey. Thus, Tyco is a citizen of Nevada and New Jersey.

17.     The Complaint alleges that Buckeye Fire Equipment Company is incorporated in North Carolina and maintains a principal place of business in North Carolina; thus, it is a citizen of North Carolina. *See* Compl. at ¶ 8.

18.     The Complaint alleges that Chemguard is incorporated in Wisconsin and maintains a principal place of business in Wisconsin. *See* Compl. at ¶ 10. Chemguard is a Texas corporation with its principal place of business in Texas. Thus, Chemguard is a citizen of Texas.[1]

---

[1] *See* Chemguard Consent to Removal filed in the related case *Zysk v. The 3M Company*, Civil Action No. 2:18-cv-02036 (ECF No. 6).

19.     The Complaint incorrectly alleges that National Foam, Inc. is incorporated in Delaware and maintains a principal place of business in Pennsylvania. *See* Compl. at ¶ 12.

20.     In fact, National Foam, Inc. is a Delaware corporation with its principal place of business and corporate headquarters located in Angier, North Carolina. *See* Declaration of Robert F. Nelson, attached hereto as Exhibit C, at ¶ 2[2]. National Foam, Inc. is not also known as "Chubb National Foam," a corporate entity unconnected to National Foam, Inc.

21.     National Foam has a facility in West Chester, Pennsylvania, where it maintains a small staff. *Id.* at ¶ 4. However, National Foam's principal place of business, corporate headquarters, and only manufacturing site is in Angier, North Carolina. *Id.* at ¶¶ 1-2 and 4-7. Since 2015, National Foam has conducted its Board of Directors meetings in Angier, North Carolina. *Id.* at ¶ 3. Accordingly, National Foam's principal place of business is in North Carolina and National Foam is a citizen of Delaware and North Carolina.

22.     In addition, Mr. Nelson was deposed in related litigation on August 28, 2018, and testified:

- Angier, North Carolina is National Foam's corporate headquarters, where corporate governance decisions are made.

- Corporate governance decisions are not made by anyone in West Chester, Pennsylvania.

- Business decisions, investment, new product development, hiring and firing, strategy, sales initiatives, and pricing all go through Mr. Nelson, whose offices are in North Carolina.

- The corporate officers who direct, control and co-ordinate National Foam's activities are located in Angier, North Carolina and the United Kingdom.

(Ex. D, Excerpts from the Deposition of Robert Nelson (Aug. 28, 2018), at 62:17 to 67:9.).

---

[2] *See,* Declaration of Robert F. Nelson, at ¶2, filed in related case *Zysk v. The 3M Company*, Civil Action No. 2:18-cv-02036 (hereinafter the "Nelson Decl.") attached hereto as Exhibit C.

23.     Plaintiff does not allege that any other defendant is a citizen of Pennsylvania.

24.     Because Plaintiff is a citizen of Pennsylvania and each of the Defendants is not a citizen of Pennsylvania, complete diversity exists among the parties to this action.

**B.     The Amount in Controversy Requirement Is Satisfied**

25.     Pursuant to 28 U.S.C. §1446(c)(2)(B), removal is proper if the court finds, by a preponderance of the evidence, that the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

26.     Chemguard's Notice of Removal "need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 554 (2014).

27.     When a plaintiff fails to expressly state the amount of damages she seeks, a court may determine whether the threshold amount is satisfied based on "a reasonable reading of the value of the rights being litigated." *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 666 (3d Cir. 2002).

28.     In her Complaint, Plaintiff alleges she "was diagnosed with kidney cancer...and underwent surgery..." *See* Compl. at ¶ 17.  She also alleges that exposure to chemicals from Defendants' products resulted in alleged "kidney cancer, high blood pressure, stress, and anxiety." *Id.* at ¶ 18.  She is alleged to have "incurred substantial medical bills, a loss of earnings and impairment of earning capacity, great pain, suffering and mental distress." *Id.* at 118.

29.     Because of Plaintiff's allegation of severe and permanent injuries, substantial medical bills, and loss of earnings and earning capacity, the totality of the circumstances requires this Court to conclude that Plaintiff seeks in excess of $75,000.00, exclusive of interest and costs. *See Spectacor Mgmt. Grp. v. Brown*, 131 F.3d 120, 122 (3d Cir. 1997) ("As a general rule, [the

amount in controversy] is determined from the good faith allegations appearing on the face of the complaint."); *Angus v. Shiley Inc.*, 989 F.2d 142, 145 (3d Cir. 1993).

30.     Thus, the requirements for diversity jurisdiction are satisfied and this case is removable to federal court by Chemguard under 28 U.S.C. § 1441(a).

## III.    REMOVAL IS PROPER BASED ON FEDERAL OFFICER REMOVAL STATUTE

31.     Although this action is removable based on diversity jurisdiction alone, Chemguard also asserts a separate and independent basis for federal jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

32.     The federal officer removal statute provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer.  Removal is appropriate under this provision where the removing defendant establishes that: "(1) [the defendant] is a "person" within the meaning of the statute; (2) the [plaintiff's] claims are based upon the [defendant's] conduct "acting under" the United States, its agencies, or its officers; (3) the [plaintiff's] claims against [the defendant] are "for, or relating to" an act under color of federal office; an (4) [the defendant] raises a colorable federal defense to the [plaintiff's] claims." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016).

33.     Removal rights under the federal officer removal statute are much broader than under the general removal statute, 28 U.S.C. § 1441.  Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999).  "The statute protect[s] officers of the federal government, and those acting under them, from interference by litigation in state court while those officers [and those under their charge] are trying to carry out their duties." *Thomas-Fish v. Aetna Steel Prod. Corp.*, 2018 WL

3630123, at *2 (D.N.J. July 31, 2018) (alterations in original, internal quotation marks omitted). This important federal policy "should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). To the contrary, 28 U.S.C. § 1442 as a whole must be "liberally construe[d]" in favor of removal. *Papp*, 842 F.3d at 812 (alterations in original, internal quotation marks omitted).

34.     The allegations in Plaintiff's Complaint and Chemguard's anticipated defenses (along with the anticipated defenses of all Defendants) directly implicate the federal officer removal statute.

35.     Plaintiff generally alleges that Defendants manufactured and sold AFFFs that allegedly contained the chemicals PFOS and/or PFOA (*see* Compl. ¶¶ 4, 7, 9, 11, 13).

36.     Plaintiff also alleges that "PFOS and PFOA contamination has been discovered in the wells of and surrounding the Naval Air Station Joint Reserve Base – Willow Grove…and Naval Air Warfare Center" at Johnsville. *Id.* at ¶ 49. Plaintiff alleges the contamination of her drinking and potable water supply is a result of the discharge used at these locations. *Id.* at ¶ 50.

37.     All requirements for removal under § 1442(a)(1) are satisfied here. *Cf., e.g., Ayo v. 3M Company*, No. 2:18-cv-00373-JS-AYS (Seybert, J.) (denying motion to remand and finding that federal officer removal was proper in a case with similar allegations against Chemguard and other manufacturers of AFFF).

**A.     MilSpec AFFF**

38.     Since the 1960s, the United States military has used AFFF that met military specifications ("MilSpec AFFF") on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property. Indeed, the United States Naval Research Laboratory developed AFFF in

response to deadly, catastrophic fires aboard the aircraft carriers USS Forrestal in 1967 and USS Enterprise in 1969.[3]  Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[4]

39.     The manufacture and sale of AFFF procured by the military, and about which Plaintiff complains here, is governed by rigorous military specifications created and administered by Naval Sea Systems Command.[5]  All such AFFF products must be "qualified for listing on the applicable Qualified Products List" prior to military procurement.[6]  Prior to such listing, a "manufacturer's … products are examined, tested, and approved to be in conformance with specification requirements."[7]  The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements.[8]  After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[9]  Naval Sea Systems Command "reserves the right to perform any of the

---

[3] See U.S. Naval Research Lab., NRL Press Release 71-09r, Navy Researchers Apply Science to Fire Fighting (Oct. 23, 2009), available at http://bit.ly/2i0y1xJ.

[4] U.S. Naval Research Lab., NRL Mem. Rep. 1001-06-8951, The U.S. Naval Research Laboratory (1923-2005): Fulfilling the Roosevelts' Vision for American Naval Power, at 37 (June 30, 2006), available at http://bit.ly/2mujJds.

[5] Mil-F-24385 (1969).  The November 1969 MilSpec and all its revisions and amendments through September 2017 are available at http://bit.ly/2mmcvqT.

[6] Id. § 3.1.

[7] Dep't of Defense SD-6, Provisions Governing Qualification, at 1 (Feb. 2014), available at http://bit.ly/2EI4J27.

[8] See, e.g., MIL-PRF-24385F(2) at 18 (2017)).  The cited MilSpec designates Naval Sea Systems Command as the "Preparing Activity."  The "Preparing Activity" is responsible for qualification.  (See Dep't of Defense SD-6 at 3.

[9] Dep't of Defense SD-6 at 1.

[quality assurance] inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements."[10]

40.     The MilSpec has always required that AFFF contain "fluorocarbon surfactants"—the class of chemical compounds that includes PFOA and PFOS.[11] The current MilSpec expressly specifies (subject to recently imposed limits) use of PFOA and PFOS in AFFF formulations.[12]

### B.     The "Person" Requirement Is Satisfied

41.     The first requirement is satisfied because Chemguard (a corporation) is a "person" under the statute.   For purposes of § 1442(a)(1), the term "person" includes "'companies, associations, firms, [and] partnerships.'" *Papp*, 842 F.3d at 812 (quoting 1 U.S.C. § 1).

### C.     The "Acting Under" Requirement Is Satisfied

42.     The second requirement ("acting under" a federal officer) is satisfied when an entity assists or helps carry out, the duties or tasks of a federal officer. *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008). "The words 'acting under' are to be interpreted broadly." *Id.* at 136. Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813.

43.     The requirement is met here because Plaintiffs directly challenge Defendants' alleged conduct in providing vital products "that, in the absence of Defendants, the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137.  MilSpec AFFF is a mission critical military product that, without the support of private contractors, the government would have to

---

[10] *See, e.g.*, MIL-PRF-24385F(2) § 4.1 (2017).  In addition, since July 1, 2006, airport operators holding an FAA Airport Operating Certificate have been required to use, with limited exceptions, MilSpec AFFF. *See* FAA CertAlert 16-05 (Sept. 1, 2016) (*available at* https://www.faa.gov/airports/airport_safety/certalerts/).

[11] *See* Mil-F-24385 § 3.2 (1969).

[12] *See* MIL-PRF-24385F(2) § 6.6 & Tables 1, 3 (2017).

11

produce for itself. Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations."[13] Accordingly, the military has long depended upon outside contractors like Tyco to develop and supply AFFF. *See Ayo*, slip op., at 26-27 (finding that Chemguard and other AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF).

44.    Plaintiff's own allegations confirm that Defendants were "acting under" federal officers of the Department of Defense and its agencies when manufacturing and selling MilSpec AFFF products allegedly used at the sites. Indeed, Plaintiff affirmatively alleges that Chemguard and the other Defendants made these products for, and sold them to, the U.S. military, which used them at the sites:

- "Defendants knew or should have known that their harmful and defective products, AFFF, would be used for various purposes…including, but not limited to, training for firefighting, actual firefighting, and use in hangar sprinkler fire suppression systems…" (*See* Compl. ¶ 67.)

- "U.S. Navy, Air National Guard, Marines, and Air Force…personnel…conducted training exercises at the Bases." (*Id.* ¶ 77.)

- "…the Military…engaged in firefighting and explosion training that required the use of AFFF." (*Id.* at ¶ 78.)

- "For decades, firefighting training activities took place at the two military Bases." (*Id.* at ¶ 79.)

- "The use of AFFF for training purposes included suppression fires and explosions on the ground, as well as coating runways in anticipation of difficult landings…." (*Id.* ¶ 81.)

---

[13] Fulfilling the Roosevelts' Vision, at 37.

45.     In designing, manufacturing and supplying the MilSpec AFFF products at issue, Chemguard acted under the direction and control of one or more federal officers.  Specifically, Chemguard acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling.[14]  Further, the AFFF products in question were subject to various tests by the United States Navy before and after being approved for use by the military and for inclusion on the Qualified Products List ("QPL") maintained by the United States Department of Defense.[15]

46.     The applicable MilSpec has always required that AFFF contain constituents from the same class of chemical compounds to which PFOA and PFOS belong.[16]  The current MilSpec expressly specifies (subject to recently imposed limits) use of PFOA and PFOS in AFFF formulations.[17]  Indeed, the September 2017 amendments to the MilSpec recognize that it is not yet technically feasible for manufacturers to completely eliminate PFOA and PFOS "while still meeting all other military specification requirements."[18]

**D.     The "Relating To" Requirement Is Satisfied**

47.     The Third Circuit has taken a "permissive view of [the 'relating to'] requirement," also "referred to as the 'nexus' or 'causation' requirement." *Papp*, 842 F.3d at 813.  To meet this requirement, "'it is sufficient for there to be a connection or association between the act in question and the federal office.'"  *Id.*  Courts "credit Defendants' theory of the case when determining whether [this] causal connection exists." *Isaacson*, 517 F.3d at 137

---

[14] *See* MIL-PRF-24385F(2) (2017).

[15] *See* Dep't of Defense, SD-6, Provisions Governing Qualification, at 1 (Feb. 2014).

[16] *See* Mil-F-24385 § 3.2 (1969).

[17] *See* MIL-PRF-24385F(2) § 6.6 & Tables 1, 3 (2017).

[18] *Id.* § 6.6.

48.     "To show causation, Defendants must only establish that the act that is the subject of Plaintiffs' attack . . . occurred *while* Defendants were performing their official duties." *Id.* at 137-38 (emphasis in original).   Here, the Plaintiff's claims arise from Chemguard's production and sale of AFFF to military specifications.   Plaintiff alleges that the use of PFOS and PFOA in AFFF rendered Chemguard's products defective.   Chemguard contends that the use of such chemicals was required by military specifications.   The conflict is apparent:   The design choices Plaintiff is attempting to impose via state tort law would create a conflict in which Defendants could not "comply with both [their] contractual obligations and the state-prescribed duty of care." *Boyle v. United Tech. Corp.*, 487 U.S. 500, 509 (1988).

### E.     The "Colorable Defense" Requirement Is Satisfied

49.     The fourth requirement is satisfied by Chemguard's assertion of the government contractor defense.   The Third Circuit has held that this defense supports removal under Section 1442(a)(1).   *Papp*, 842 F.3d at 814.

50.     At the removal stage, a defendant need only show that its government contractor defense is colorable; that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'"   *Papp*, 842 F.3d at 815 (alteration in original, citation omitted).   As the Third Circuit has stated, "[a] defendant 'need not win his case before he can have it removed.'"   *Id.* (quoting *Willingham*, 395 U.S. at 407); *see also Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court.") (citation omitted). Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants."   *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783-84 (E.D. Pa. 2010).   "A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the

defense' at this stage. Instead, [the court] only determines whether there are sufficient facts alleged to raise a colorable defense." *Kraus v. Alcatel-Lucent*, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018).

51.     Under the government contractor defense, the defendant is not liable for alleged defects or negligence with respect to military equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

52.     Chemguard has satisfied these elements for purposes of removal. As discussed above, Naval Sea Systems Command approved reasonably precise specifications, governing AFFF formulation, performance, testing, storage, inspection, packaging, and labeling.[19] Plaintiff admits that these products appeared on the DOD Qualified Products Listing (Compl. ¶ 61), which could have happened only if Naval Sea Systems Command had first determined that they conformed to the Mil-Spec.[20]

53.     In the Complaint, Plaintiff attempts to characterize the Military Specifications as "performance specifications." (Compl. ¶¶ 53-58.) Plaintiff's allegations are both factually incorrect and legally unsupportable. Courts have never drawn a bright line distinction between performance and design requirements. The "reasonably precise" specification standard can be met where government performance specifications effectively determine or significantly constrain design choices. *E.g.*, *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 1001 (7th Cir. 1996). The standard is also met where the contractor incorporated government performance specifications into

---

[19] *See* MIL-PRF-24385F(2) (2017).

[20] *See* Dep't of Defense SD-6, Provisions Governing Qualification, *supra,* at 1 (Feb. 2014).

a design that the government subsequently reviewed and approved. *Harduvel v. Gen'l Dynamics Corp.*, 878 F.2d 1311, 1320 (11th Cir. 1989). The critical issue is whether the government exercised discretion in approving the design of the product. Plaintiff is also wrong factually. The military specifications at issue addressed ***both*** performance and design, and even the performance requirements constrain the design of the product, requiring (as the military has stated) the use of perfluorinated compounds ("PFCs"). Further, the military was extensively involved in the development of Mil-Spec AFFF (including, among other things, patenting and licensing the technology),[21] and expressly approved AFFF containing PFCs (including PFOS or PFOA).[22] Moreover, the plain terms of the military specifications demonstrate that they go beyond performance. For example, every iteration of the Mil-Spec since 1969 has provided that "[c]oncentrates shall consist of fluorocarbon surfactants plus other compounds as required to conform to the requirements specified hereinafter."[23]

54.     The government was also adequately informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring Mil-Spec AFFF. The United States has long understood that AFFF may contain or break down into fluorocarbons (including PFOS and/or PFOA), that AFFF constituents can migrate through the soil and potentially reach groundwater, and that this may raise environmental or health

---

[21] *See* U.S. Patent No. 3,258,423, a Method of Extinguishing Liquid Hydrocarbon Fires, assigned to the United States as represented by the Secretary of the Navy, and dated June 28, 1966), *available at* available at http://pdfpiw.uspto.gov/.piw?PageNum=0&docid=03258423&IDKey=97716743EC6D%0D%0A&HomeUrl=http%3A%2F%2Fpatft.uspto.gov%2Fnetacgi%2Fnph-Parser%3FSect1%3DPTO1%2526Sect2%3DHITOFF%2526d%3DPALL%2526p%3D1%2526u%3D%25252Fnetahtml%25252FPTO%25252Fsrchnum.htm%2526r%3D1%2526f%3DG%2526l%3D50%2526s1%3D3%2C258%2C423.PN.%2526OS%3DPN%2F3%2C258%2C423%2526RS%3DPN%2F3%2C258%2C423).

[22] *See, e.g.*, MIL-PRF-24385F(2) § 6.6 & Tables 1, 3 (2017).

[23] *See, e.g., id.* § 3.2.

16

issues.[24]   Indeed, the military specifications have long included testing and requirements for toxicity, chemical oxygen, and biological demand.[25]   For example, as early as October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from firefighting exercises are considered to have adverse effects environmentally."[26]   In June 1991, the Air Force stated that past Air Force fire training activities resulted in "adverse environmental impact," including "soil contamination" and the "potential" for "groundwater contamination."[27]   More recently, in a November 2017 report to Congress, the Department of Defense acknowledged the concerns raised by the EPA regarding PFOS and PFOA in drinking water.   Nonetheless, it still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[28]   Indeed, Naval Sea Systems Command continues to require that Mil-Spec AFFF contain "fluorocarbon surfactants,"[29] and expressly specifies (subject to recently imposed limits) use of "PFOS" and "PFOA" in AFFF formulations.[30]

---

[24] *See, e.g.*, EPA, Revised Draft Hazard Assessment of Perfluorooctanoic Acid and its Salts, at 1-6 (Nov. 4, 2002).

[25] *See, e.g.*, MIL-F-24385 §§ 3.16 & 4.7.16 (May 2, 1977).

[26] *See* Membrane Treatment of Aqueous Film Forming Foam (AFFF) *Wastes for Recovery of Its Active Ingredients, at* 1 (October 1980), *available at* http://www.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

[27] USAF, Engineering Technical Letter: Site Selection Criteria for Fire Protection Training Areas, at 2 (June 14, 1991).

[28] Dep't of Defense, Aqueous Film Forming Foam Report to Congress, at 1-2 (Nov. 3, 2017), *available at* http://www.denix.osd.mil/derp/home/documents/aqueous-film-forming-foam-report-tocongress/.

[29] MIL-PRF-24385F(2) § 3.2 (2017).

[30] *Id.* § 6.6 & Tables 1, 3.

55.   At a minimum, this constitutes colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of Mil-Spec AFFF after weighing the fire-suppression benefits against the alleged risks. *See In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht v. A.O. Smith Water Prods.*, 2011 WL 5109532, at *5 (S.D.N.Y. Oct. 21, 2011) ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'") (citation omitted).   Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *In re Agent Orange*, 517 F.3d at 89-90.

WHEREFORE, Chemguard, Inc. hereby removes this action from the Court of Common Pleas of Montgomery County, Pennsylvania to the United States District Court for the Eastern District of Pennsylvania.


Dated:  October 9, 2018                     SHOOK, HARDY & BACON LLP


                                    By:   _____
                                          Joseph H. Blum
                                          Erin P. Loucks
                                          Two Commerce Square
                                          2001 Market Street, Suite 3000
                                          Philadelphia, PA 19103
                                          jblum@shb.com
                                          eleffler@shb.com

                                          *Attorneys for Defendant*
                                          *Chemguard, Inc.*

## CERTIFICATE OF SERVICE

I certify that on October 9, 2018, I caused a true and correct copy of the foregoing **NOTICE**

**OF REMOVAL,** with its Exhibits, to be served on counsel of record by ECF notification,

electronic mail, and/or first-class mail:

Mark R. Cuker
Cuker Law Firm, LLC
2005 Market Street, Suite 1120
Philadelphia, PA 19103

W. Steven Berman
Napoli Shkolnik PLLC
1 Greentree Centre, Suite 201
10,000 Lincoln Drive
Marlton, NJ 08053
*Counsel for Plaintiff*

Keith E. Smith
Greenberg Traurig, LLC
2700 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
*Counsel for Defendant National Foam, Inc.*

_____
Erin Loucks

# EXHIBIT A

 CT Corporation

**Service of Process Transmittal**
09/10/2018
CT Log Number 534024853

TO: STACIE SIMPSON
Navigant Consulting
PACE CLAIM SERVICES, LLC, 100 AMERICAN METRO BLVD STE 108
HAMILTON, NJ 08619-2319

RE: **Process Served in Texas**

FOR: Chemguard, Inc.  (Domestic State: TX)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Kathleen Kervin, Pltf. vs. 3M Company, etc., et al., Dfts. // To: Chemguard, Inc. |
| **DOCUMENT(S) SERVED:** | Attachment(s), Notice(s), Cover Sheet, Complaint, Verification |
| **COURT/AGENCY:** | MONTGOMERY COUNTY COMMON PLEAS COURT, PA<br>Case # 201820572 |
| **NATURE OF ACTION:** | Asbestos Litigation - Personal Injury |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Dallas, TX |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 09/10/2018 at 14:15 |
| **JURISDICTION SERVED :** | Texas |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after recive |
| **ATTORNEY(S) / SENDER(S):** | W. Steven Berman<br>NAPOLI SHKOLNIK PLLC<br>1 Greentree Centre<br>Suite 201<br>10,000 Lincoln Drive<br>Marlton, NJ 08053<br>212397-1000 |
| **REMARKS:** | only active entity // The documents received have been modified to reflect the name of the entity being served. |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 09/10/2018, Expected Purge Date: 09/15/2018<br><br>Image SOP<br><br>Email Notification,  STACIE SIMPSON  stacie.simpson@pace-claims.com |
| **SIGNED:**<br>**ADDRESS:**<br><br><br>**TELEPHONE:** | C T Corporation System<br>1999 Bryan Street<br>Suite 900<br>Dallas, TX 75201<br>214-932-3601 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

G-10-18

1. The 3M Company f/k/a Minnesota Mining and Manufacturing, Co
   3M Center
   St. Paul, MN 55144

2. THE 3M COMPANY, f/k/a Minnesota Mining and Manufacturing, Co.
   c/o The Corporation Company
   7700 East Arapahoe Road, Suite 220
   Centennial, CO 80112-1268

3. Tyco Fire Products LP, Successor-in-Interest to The Ansul Company
   One Stanton Street
   Marinette, Wisconsin 54143

4. Angus Fire
   141 Junny Rd.
   Angier, NC 27501

5. National Foam, Inc.
   Corporation Trust Center
   1209 Orange Street
   Wilmington, Delaware 19801

6. Buckeye Fire Equipment Co.
   10 Kings Road Mountain
   North Carolina 28086

7. Chemgaurd
   One Stanton Street
   Marinette, Wisconsin 54143

## IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA

Case # 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

F 10-18

KATHLEEN KERVIN

vs.

3M COMPANY F/K/A MINNESOTA MINING AND
MANUFACTURING COMPANY

NO.  2018-20572

### NOTICE TO DEFEND - CIVIL

You have been sued in court. If you wish to defend against the claims set forth in the
following pages, you must take action within twenty (20) days after this complaint and notice
are served, by entering a written appearance personally or by attorney and filing in writing
with the court your defenses or objections to the claims set forth against you. You are warned
that if you fail to do so the case may proceed without you and a judgment may be entered
against you by the court without further notice for any money claimed in the complaint or for
any other claim or relief requested by the plaintiff. You may lose money or property or other
rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO
NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW.
THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A
LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE
TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER
LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

LAWYER REFERENCE SERVICE
MONTGOMERY BAR ASSOCATION
100 West Airy Street (REAR)
NORRISTOWN, PA 19404-0268

(610) 279-9660, EXTENSION 201

PRIF0034
R 10/11

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA

KATHLEEN KERVIN

vs.

3M COMPANY F/K/A MINNESOTA MINING AND
MANUFACTURING COMPANY

NO.  2018-20572

## CIVIL COVER SHEET

State Rule 205.5 requires this form be attached to any document commencing an action in the Montgomery County Court of Common Pleas.  The information provided herein is used solely as an aid in tracking cases in the court system.  This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.

Name of Plaintiff/Appellant's Attorney:   MARK R CUKER, Esq., ID: 21182

Self-Represented (Pro Se) Litigant ☐

**Class Action Suit**        ☐ Yes    ☒ No

**MDJ Appeal**    ☐ Yes    ☒ No          **Money Damages Requested** ☒

**Commencement of Action:**          **Amount in Controversy:**

Complaint          More than $50,000

## Case Type and Code

Tort: _____

Other _____

**Other:**    WATER CONTAMINATION

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**CUKER LAW FIRM, LLC**
Mark R. Cuker (Pa. I.D. 21182)
2005 Market Street, Suite 1120
Philadelphia, PA 19103
Telephone: 215-531-8522
Email: mark@cukerlaw.com

*Attorneys for Plaintiff,*

**NAPOLI SHKOLNIK PLLC**
W. Steven Berman (PA Bar No. 45927)
1 Greentree Centre, Suite 201
10,000 Lincoln Drive
Marlton, NJ 08053
(212) 397-1000

*Attorneys for Plaintiff,*
*Kathleen Kervin*

| | |
|---|---|
| Kathleen Kervin<br>1054 W. Bristol Road<br>Warminster, PA<br><br><br><br><br>Plaintiff,<br><br>v.<br><br>3M Company (f/k/a Minnesota Mining and<br>Manufacturing Company)<br>Angus Fire (a/k/a Angus International)<br>Ansul (a/k/a Ansul Chemical Company;<br>a/k/a The Ansul Company<br>a/k/a Ansul Fire Protection<br>Buckeye Fire Equipment Company<br>Chemguard, Inc. and National Foam, Inc.<br>(a/k/a Chubb National Foam)<br><br>Defendants. | MONTGOMERY COUNTY<br>COURT OF COMMON PLEAS<br><br><br>Civil Action No. _____<br>JURY TRIAL DEMANDED |

## COMPLAINT

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## NOTICE TO DEFEND - CIVIL

You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.**

**IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.**

**LAWYER REFERENCE SERVICE**
**MONTGOMERY BAR ASSOCIATION**
**100 West Airy Street (REAR)**
**NORRISTOWN, PA 19401**

**(610) 279-9669, EXTENSION 201**

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1.  Plaintiff Kathleen Kervin is an individual residing at 1054 W. Bristol Road, Warminster, PA 18974.

2.  Plaintiff Kervin has resided in Warminster continuously since 1997.

**Defendants**

3.  Defendant, The 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133.

4.  At all times relevant hereto, 3M manufactured fire suppression products, including Aqueous Fire Fighting Foam (hereinafter "AFFF") that contained PFCs including PFOS and/or related fluorochemicals that can degrade to PFOA or PFOS.

5.  Defendant, Angus Fire (a/k/a Angus International) ("Angus") is part of Angus International, and has corporate headquarters in Bentham, United Kingdom.  Angus Fire maintains a place of business in the United States at 141 Junny Road, Angier, NC 27501.

6.  Defendant, Ansul (a/k/a Ansul Chemical Company; a/k/a The Ansul Company a/k/a Ansul Fire Protection) (hereinafter "Ansul") is a Wisconsin corporation, having a principal place of business at One Stanton Street, Marinette, WI 54143.

7.  At all times relevant, Ansul manufactured fire suppression products, including AFFF that contained PFCs including PFOS and/or related fluorochemicals that can degrade to PFOA or PFOS.

8.  Defendant, Buckeye Fire Equipment Company ("Buckeye") is a North Carolina corporation, with its principal place of business at 110 Kings Road, Kings Mountain, NC 28086.

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

9.  At all times relevant, Buckeye manufactured fire suppression products, including AFFF that contained PFCs including PFOS and/or related fluorochemicals that can degrade to PFOA or PFOS.

10. Defendant, Chemguard, Inc. is a Wisconsin corporation, having a principal place of business at One Stanton Street, Marinette, WI 54143.

11. At all times relevant, Chemguard manufactured fire suppression products, including AFFF that contained PFCs including PFOS and/or related fluorochemicals that can degrade to PFOA or PFOS.

12. Defendant, National Foam, Inc. (a/k/a Chubb National Foam) is a Delaware corporation with its principle place of business at 350 East Union Street, West Chester, PA 19382.

13. At all times relevant, National Foam manufactured fire suppression products, including AFFF that contained PFCs including PFOS and/or related fluorochemicals that can degrade to PFOA or PFOS.

## Jurisdiction

14. This court has jurisdiction due to diversity of citizenship under 28 U.S. §1332 and the amount in controversy exceeds $75,000.

## GENERAL FACTUAL ALLEGATIONS

15. All allegations, supra are incorporated herein as if specifically set forth herein at length.

16. Plaintiff Kathleen Kervin has resided at 1054 W. Bristol Road in Warminster, PA since 1997.

17. Ms. Kervin was diagnosed with kidney cancer in December 2016 and underwent surgery at Fox Chase Cancer Center in March 2017.

4

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 09/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

18. As a result of her exposure to PFOA and PFOS Ms. Kervin has suffered kidney cancer, high blood pressure, stress and anxiety.

**Fluorinated Chemicals**

19. Flourochemicals are 8 carbon length fluorinated molecules that are typically used as fire suppression agents, refrigeration, and as specialty solvents.

20. Fluorochemicals are potential precursors for PFOA, PFOS, PFCAs and/or PFASs.

21. A perfluorinated chemical is one in which all the carbon-hydrogen bonds in a carbon chain have been replaced by carbon-fluorine bonds.

22. Due to their differences in electronegativities, the breaking of a carbon-fluorine bond requires a large single input of energy to overcome the element's attraction for one another.

23. Chemical and physical processes occurring in nature lack sufficient energy to break carbon-fluorine bonds.

24. There are no known biological organisms that are able to break these bonds and as a result, these carbon-fluoride bonds remain intact indefinitely.

**PFASs**

25. Poly-and perfluorinated alkyl substances (hereinafter referred to as PFASs) are man-made members of the general category of perflourinated sulphonates and include compounds with carbon chain lengths of four or more.

26. PFASs have been in use for over sixty (60) years.

27. Perfluoroctanesulfonic acid ("PFOS") and perfluoroctanoic acid ("PFOA") are the two (2) most prevalent PFASs.

28. As perflourinated compounds, PFOS and PFOA have unique properties that cause them to be classified as persistent, bioaccumulative, and toxic.

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

29. Due to the strength of their multiple carbon-fluorine bonds, once PFOS and PFOA is present in the environment, it does not undergo any further chemical, microbial, or photolytic degradation or breakdown.

30. PFOA is particularly persistent in water and soil because it is water soluble; it can readily migrate from soil to groundwater.

## Use of PFAS

31. In the 1940s and 1950s, Defendant, 3M Company, began creating PFASs and incorporating them into its products.

32. In the early 1960s, Defendant 3M Company engineered, designed and developed its aqueous film forming foam (AFFF) using the surfactant containing PFCs and began to market it under the brand name "Light Water™".

33. The AFFF contained PFAS including PFOS and related fluorochemicals that can degrade to PFOA or PFOS.

34. Defendant, 3M Company, promoted and sold the AFFF for the purposes of preventing, suppressing and extinguishing fires involving aviation fuel and other flammable liquids.

35. Through at least 2002, 3M manufactured and sold the AFFF containing PFCs and fluorocarbon surfactants.

36. As early as 1964, Defendant 3M was aware that the stability of carbon-fluoride bonds prevented their PFAS products from degrading under natural processes.

37. Defendants, Ansul, Buckeye, Chemguard and National Foam also engineered, developed, manufactured, marketed and sold AFFF contained PFCs including PFOS and related fluorochemicals that can degrade to PFOA or PFOS.

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

38. PFOS and PFOA can remain in the environment for decades, leach through soil and infiltrate and pollute groundwater and the environment.

39. Once water is contaminated by PFOS or PFOA, it cannot be removed by boiling the water or using chlorine and other disinfectants that are typically added to public drinking water systems.

40. Toxicology studies show that PFOS and PFOA are readily absorbed after oral exposure and accumulate primarily in the serum, kidney, and liver.

41. PFOS and PFOA can cross the placenta from mother to fetus and from mother to infant through breast feeding.

42. Once ingested, PFOS and PFOA have a half-life within the human body of up to 9 years.

43. PFOS and PFOA are toxic and have adverse health effects on humans.

44. There are a number of health risks associated with exposure to PFOS and PFOA, and these risks are present even when PFOS and PFOA are ingested at seemingly low levels (less than 1 part per billion).

45. PFOS and PFOA exposure is associated with increased risk of various diseases and cancers in humans, including, but not limited to: testicular cancer, bladder cancer, kidney cancer, prostate cancer, multiple myeloma, disorders such as thyroid disease, liver disease, high cholesterol, ulcerative colitis, and pregnancy-induced hypertension, non-Hodgkin lymphoma, increased uric acid as well as other conditions.

46. Injuries, however, are not sudden; rather, they can arise months, years or decades after exposure to PFOS and/or PFOA.

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the
Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

47. The Defendants also knew or should have known that PFCS are highly soluble in water, and highly mobile and highly persistent in the environment, and highly likely to contaminate water supplies if released into the environment.

48. The Defendants marketed and sold their products, AFFF, with knowledge that large quantities of their toxic, harmful and defective product, AFFF, would be used in training exercises and in emergency situations at Military bases and civilian fire facilities in such a manner that dangerous chemicals would be released into the environment.

49. As discussed in more detail below, PFOS and PFOA contamination has been discovered in the wells of and surrounding the Naval Air Station Joint Reserve Base – Willow Grove (hereafter referred to as NASJRB-Willow Grove) and Naval Air Warfare Center (f/k/a Naval Air Development Center, Johnsville).   NASJRB-Willow Grove and Naval Air Warfare Center (f/k/a Naval Air Development Center, Johnsville are hereinafter referred to as "Bases").

50. The PFOS and PFOA contamination of the public and private wells and Plaintiff's drinking/potable water supply is the result of the discharge of AFFF manufactured by the Defendants and used on the Bases.

**Military Specification for AFFF**

51. The U.S. Military did not contract with Defendants to supply it with a product that generated massive amounts of toxic waste without reasonable instructions on how to responsibly manage them.

52. The Department of the Navy never played an active role in the design and commercialization of a commercial AFFF product.

8

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

53. As a customer of AFFF, the Department of the Navy established product performance specifications.

54. A performance specification defines how a product must perform when used as intended, which a manufacturer then designs a product to meet.

55. In 1969, the Department of the Navy issued Military Specification MIL-F-24385 for AFFF, a performance specification.

56. Defendants assigned manufacturing specifications of their own to their AFFF to ensure that each time it was manufactured, the same procedures and methods were used. The Department of the Navy did not establish manufacturing specifications and did not instruct Defendants to apply any specific manufacturing specification.

57. To ensure that a product is manufactured consistently to meet the performance specification of its customer(s), Defendants established both manufacturing specifications and quality specifications (reflected in the manufacturer's Material Safety Data Sheet MSDS) of their own.

58. MIL-F-24385 is not a manufacturing specification.

59. MIL-F-24385 covered "the requirements for aqueous film-forming foam(AFFF) liquid concentrate fire extinguishing agents consisting of fluorocarbon surfactants and other compounds as required to conform to the requirements specified hereafter."

60. If the Navy found that a manufacturer's product satisfied MTL-F-24385 performance expectations, the Navy placed the product on the Department of Defense Qualified Product Listing.

61. Defendants each engineered, designed, manufactured, distributed and sold AFFF that was included on the Department of Defense Qualified Product Listing for MIL-F-24385.

9

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the
Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

62. In its Military Specifications (a/k/a and hereinafter referred to as "MILSPEC") for Fire Extinguishing Agent, Aqueous Film Forming Foam (AFFF), the United States of America, through its said Agencies, required that "The material shall have no adverse effect on the health of personnel when used for its intended purpose." This provision remained a part of the specification throughout the time defendants sold AFFF products to the U.S. government.

63. Pursuant to MIL-F-24385, a mere solicitation for AFFF, manufacturers were free to develop any AFFF composition that met the performance specification. The Defendants devised their own product manufacturing and quality specifications in order to make AFFF that would meet the performance requirements set forth by the U.S. Military in MIL-F-24385.

64. Defendants each chose to include PFOS and PFOA as ingredients in their MIL-F-24385-compliant AFFF and had the complete discretion to do so under §3.1 of MIL-F-24385 "[t]he concentrate shall consist of fluorocarbon surfactants plus other compounds as required to conform to the requirements specified hereunder."

65. The inclusion of PFOA and PFOS in AFFF sold in compliance with MIL-F-24385 violated the specification that "The material shall have no adverse effect on the health of personnel when used for its intended purpose."

66. The said AFFF was sold to the US Navy, US Air Force, and Pennsylvania Air National Guard for use on its various and numerous naval vessels and at military bases including NASJRB-Willow Grove and Naval Air Warfare Center (f/k/a Naval Air Development Center, Johnsville).  (NASJRB-Willow Grove and Naval Air Warfare Center (f/k/a Naval Air Development Center, Johnsville are hereinafter referred to as "Bases").

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $390.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

67. Defendants knew or should have known that their harmful and defective products, AFFF, would be used for various purposes on said Bases, including, but not limited to, training for firefighting, actual firefighting, and use in hangar sprinkler fire suppressant systems, which would cause the AFFF to drain into the ground and eventually pollute or contaminate the ground water beneath the Bases and eventually migrate into the drinking/potable water of the Plaintiff.

68. The harmful and defective products, AFFF, manufactured by the Defendants contained PFOS, PFOA, and/or certain other perfluorinated compounds ("PFC") that degrade into PFOS or PFOA.

69. The Defendants manufactured and/or sold their harmful and defective products, AFFF, when they knew or should have known that their products had an adverse effect on the health of persons when used for its intended purposes.

70. The Defendants failed to warn about the adverse and harmful health effects of their harmful and defective AFFF products, when they knew or should have known that their products had an adverse effect on the health of persons when used for its intended purposes.

71. While using AFFF for its intended purposes, the said harmful and defective products were released into the environment contaminating the soil and groundwater of the bases and migrated into the groundwater and eventually into the drinking/potable water of the Plaintiff.

72. It was reasonably foreseeable to Defendants that Plaintiff, as users of groundwater that supplied the wells near the Bases, would use and consume groundwater contaminated by their products at the Bases and would be harmed as a result.

11

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

73. In the 1970s-1980s, the Defendants were well aware of the health risks and adverse human health effects of exposure to the harmful and defective products which contained PFOA and PFOS.

74. Despite this knowledge, the Defendants continued to manufacture, market and/or sell their defective AFFF, without warning and/or sufficiently warning consumers, purchasers and users of the health risks and/or adverse human effects and failed to recall their defective and harmful products when the said defective and harmful products were taken off of the market.

75. The Defendants, as the manufacturers of AFFF, knew or should have known that the inclusion of PFOS, PFOA and related fluorochemicals that degrade to PFOA or PFOS in AFFF presented an unreasonable risk to human health and the environment.

**AFFF Use at the Willow Grove and Warminster Bases**

76. At any given time during their operation, the Bases housed thousands of gallons of AFFF concentrate manufactured by Defendants, which were/are stored in buckets, drums, tankers and sprinkler systems.

77. U.S. Navy, Air National Guard, Marines, and Air Force (hereinafter referred to collectively as "Military") personnel, as well as civilian firefighters, conducted training exercises at the Bases.

78. In part, the Military and civilian firefighters engaged in firefighting and explosion training that required the use of AFFF.

79. For decades, firefighting training activities took place at the two military Bases.

80. Each site also possessed and maintained aircraft hangars protected by ceiling fire suppression units holding hundreds of gallons of AFFF.

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 09/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

81. The use of AFFF for training purposes included suppression fires and explosions on the ground, as well as coating runways in anticipation of difficult landings, all of which resulted in acres of foam-covered soil.

82. Accidental discharges occasionally occurred within the aircraft hangers resulting in the discharge of hundreds of gallons of AFFF. The personnel at the Bases cleaned the hangars by washing the foam down drains which leached into the ground water which provided drinking/potable water to those serving and working on the bases and surrounding residents.

83. Once the ground water of the bases was contaminated and polluted with PFOA and PFOS, military and civilian personnel on the base became exposed to PFOA and PFOS in their drinking/cooking water, bathing water, etc.

84. The polluted and contaminated ground water found its way into the aquifer and into the drinking/potable water of the areas identified, supra.

85. Once PFOA and PFOS contaminated and polluted the drinking/potable water the Affected Area, military and civilian personnel stationed on the bases were exposed to PFOA and PFOS in their drinking/cooking water, bathing water, etc. while living in the areas off the bases and/or while eating, drinking, etc. in restaurants, cafes, homes of friends, etc. in the said areas.

86. Once PFOA and PFOS contaminated and polluted the drinking potable water in the areas near the bases, the residents of said areas were exposed to PFOA and PFOS in their drinking/cooking water, bathing water, etc. while living and working in the said Affected Area and/or while eating, drinking, etc. in their homes, the homes of friends, restaurants, cafes, etc. in the said areas.

Case # 2018-20572-0 Docketed at Montgomery County Prothonotary on 09/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

87. At all times mentioned in paragraphs 65 and 66 above the individuals ingesting the polluted and contaminated water/food/sustenance were unaware that they were consuming/ingesting polluted and contaminated substances containing PFOA and PFOS.

88. Upon information and belief, instructions and warnings supplied with the AFFF sold by the Defendants did not adequately describe the dangers associated with use and disposal of AFFF.

89. In 2002, 3M ceased production of AFFF manufactured with PFOS due to health and environmental concerns.

90. Upon information and belief, 3M and the other defendants had known of these dangers for years, if not decades, before ceasing manufacture.

91. Even though 3M, who was the predominant manufacturer of PFOS-based AFFF, ceased production of PFOS-based AFFF in 2002, neither 3M nor any other Defendant that used these chemicals recalled its dangerous products.

92. Consequently, upon information and belief, Military personnel and civilians at the Bases continued to use PFOS-laden AFFF for trainings and emergencies until the base closed in 2011.

93. According to one study, as of 2011, there were still 1,972,000 gallons of PFOS-based AFFF stockpiled in the United States.

94. Further, upon information and belief, the Military continues to store the PFOS-based AFFF on the Bases.

**Regulatory Action for Safe Drinking Water**

95. In 2012, the EPA included PFOS and PFOA in its Third Unregulated Contaminant Monitoring Rule ("UCMR3"). By placing PFOS and PFOA on this list, the EPA required

14

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

certain water providers across the country, including those in the Affected Area, to test their water for the presence of PFOA and PFOA.

96. Between November 2013 and June 2014, the Warminster Public Authority tested its wells in compliance with UCMR3. The testing showed PFOS levels ranging from 40 ppt to 1090 ppt and PFOA levels ranging from 20 ppt to 890 ppt. The Warminster Public Authority closed six of its wells due to PFOS and/or PFOA contamination.

97. In May 2016, the EPA set its Health Advisory for Lifetime Exposure at 70 ppt for the sum of PFOA and PFOS concentrations in drinking water.

98. Other states and/or organizations have suggested limiting exposure to even lower levels of PFOS and/or PFOA.

99. Negative health outcomes associated with exposure to PFOA-contaminated drinking water at 50 ppt has been found in a scientific study in and around Parkersburg, West Virginia.

100. Certain states have also promulgated advisory exposure levels lower than the EPA's advisory level, including the State of New Jersey, which promulgated and advisory exposure level for FOA of 14 ppt and the State of Vermont, which set its enforcement standard at 20 ppt for PFOA and 30 ppt for PFOS.

101. As a result of the testing performed after the EPA's May 2016 Lifetime Health Advisories were issued for PFOS and PFOA, numerous residents, including Plaintiff thereafter learned that their drinking/potable water supply was contaminated with dangerous levels of PFOS and/or PFOA.

102. The United States of America, through the Department of the Navy, has offered assistance to several impacted residents, but its efforts are too little, too late.

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

103. The contamination of the public and private drinking/potable water wells in the areas surrounding the Bases with high concentration levels of PFOS and PFOA resulted from the Defendant's manufacture of AFFF through the use of the defective/harmful product on the Bases.

104. As set forth herein, Despite said knowledge, the Defendants continued to manufacture, market, sell and/or introduce into the stream of commerce their harmful and defective products, AFFF, without warning and/or sufficiently warning consumers, purchasers, users and reasonably foreseeable innocent bystanders, such as Plaintiff, of the health risks and/or adverse human health effects and failed to recall their defective and harmful products when the said defective and harmful products were taken off of the market.

105. Since 2014, many private and public drinking/potable drinking water wells tested within the Affected Area have shown concentrations of PFOS and PFOA.

106. Multiple studies suggest that even small concentrations of PFCs are harmful to humans.

## COUNT I

### Negligence

107. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

108. The Defendants had a duty to design, engineer, manufacture, develop, fabricate, test, sell, and/or distribute AFFF in a manner that avoided harm to those who foreseeably would come into contact with it.

109. As discussed, supra, Defendants knew or should have known that the manufacture, distribution and sales of AFFF containing PFOS and PFOA was hazardous to human health and the environment.

16

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

110. Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to manufacture, distribute and sell AFFF containing PFOS and PFOA because it was inevitable that said harmful and defective products migrate off of the Bases and contaminate the ground water and potable/drinking water supply of the Bases and Affected Area.

111. The Defendants also knew or should have known that PFCs are highly soluble in water, and highly mobile and highly persistent in the environment, and highly likely to contaminate water supplies if released to the environment.

112. The Defendants marketed and sold their products, AFFF, with knowledge that large quantities of their toxic, harmful and defective product, AFFF, would be used in training exercises and in emergency situations at Military bases in such a manner that dangerous chemicals would be released into the environment.

113. The harm caused by the Defendants' harmful and defective products to Plaintiff was reasonably foreseeable.

114. The drinking/potable water of the public and private wells in the Affected Area are contaminated with unsafe levels of PFOS and PFOA.

115. As a result of Defendants' negligent, reckless and/or intentional acts and omissions alleged herein, both the public and private drinking/potable water supplies in the Affected Area are contaminated with PFOS and PFOA.

116. Defendants' failure to warn/sufficiently warn of the effects of their harmful and defective products resulted in the contamination of private and public drinking/potable water supplies with PFOS and PFOA.

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

117. Plaintiff Kathleen Kervin has been diagnosed with kidney cancer which resulted from her exposure to PFAS in her drinking water supply.

118. As a result of Defendants' negligence, Plaintiff suffered cancer, incurred substantial medical bills, a loss of earnings and impairment of earning capacity, great pain, suffering and mental distress.

## COUNT II

### Defective Product – Failure to Warn

119. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

120. At all times relevant, Defendants were in the business of, among other things, designing, engineering, manufacturing, developing, fabricating, testing, selling, and/or distributing AFFF.

121. As designers, engineers, manufacturers, developers, fabricators, testers, sellers, and/or distributers of a commercial product, the Defendants had a duty to provide reasonable instructions and adequate warnings about the risks of injuries and harmful effects to human health and the environment posed by their products.

122. Defendants knew or should have known that the foreseeable storage, use and disposal of the AFFF that they designed, engineered, developed, fabricated, tested, manufactured, sold, and distributed had the capacity to enter the water supply, to persist there for decades, and to cause harm to human health, property and the environment.

123. These risks were not obvious to users of the AFFF.

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

124. Defendants failed to provide warnings to the users that the use of Defendants' harmful and defective product could result in the contamination of groundwater and drinking/potable water supplies.

125. Defendants failed to provide warnings to the users of the dangers to human health, property and the environment if their harmful and defective product was permitted to contaminate the groundwater or drinking/potable water supply.

126. Defendants failed to provide warnings to the users of how indestructible their product was when released into the environment due to its chemical stability.

127. Sufficient and adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by the Defendants' harmful and defective products.

128. Had Defendants provided adequate warnings, the users of their AFFF would have taken adequate measures to store, use, and dispose of AFFF so as to reduce or eliminate groundwater and drinking/potable water contamination from AFFF.

129. As a result of Defendants' failure to warn against the likelihood of contamination from their AFFF, the groundwater and drinking/potable water became contaminated with toxic PFOS and PFOA.

130. As a direct and proximate result of Defendants' failure to warn of the environmental and health impacts caused by their harmful and defective product, AFFF, Plaintiff has suffered injuries as aforesaid.

131. As a direct and proximate result of Defendants' designing, engineering, manufacturing, developing, fabricating, testing, selling, and/or manufacturing, or distributing of a defective product, Plaintiff has suffered and continue to suffer injuries as aforesaid.

**COUNT III**

19

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

### Defective Product – Design Defect

132. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

133. At all times relevant, Defendants were in the business of, designing, engineering, manufacturing, developing, fabricating, testing, selling, and/or distributing AFFF.

134. Defendants negligently designed, engineered, developed, fabricated and tested AFFF and PFCs, and thereby failed to exercise reasonable care to prevent the AFFF and the components from presenting an unreasonable risk of harm to human health and the environment and persons who would come in contact with it, including Plaintiff.

135. It was foreseeable that toxic chemicals from the AFFF that Defendants designed, engineered, developed, fabricated, tested, manufactured, sold and distributed would enter the water supply of the Plaintiff and cause harm to his person, and property and the environment.

136. Alternative designs of AFFF were available, technologically feasible and practical, and would have reduced or prevented the harm to Plaintiff.

137. A reasonable alternative design would, at a reasonable cost, have reduced or eliminated the foreseeable risks of harm posed by AFFF.

138. The AFFF designed, engineered, developed, fabricated and tested manufactured, sol, or distributed by the Defendants was defective in design because the foreseeable risk of harm posed by the AFFF could have been reduced or eliminated by the adoption of a reasonable alternative design.

139. Defendants' products were defective at the time of manufacture, and at the time they left Defendants' control.

20

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

140. As a result of Defendants' designing, engineering, manufacturing, developing, fabricating, testing, selling, and/or distributing designed product, the drinking/potable water supplies in and around the Bases became contaminated with dangerous and toxic chemicals and damaged the Plaintiff.

141. As a direct and proximate result of Defendants' designing, engineering, manufacturing, developing, fabricating, testing, selling, and/or manufacturing, or distributing of a defective product, Plaintiff has suffered and continue to suffer damages, including medical monitoring damages; monetary damages associated with the investigation, treatment, remediation, and monitoring of their drinking/potable water; increased costs of drinking/potable water, economic loss, property damages, including, without limitation, loss of value, annoyance, disturbance, intrusion, harassment and inconvenience; all for which Plaintiff are entitled to recover damages.

142. As a result of Defendants' designing, engineering, manufacturing, developing, fabricating, testing, selling, and/or distributing a defective produce, Defendants are strictly liable in damages to the Plaintiff.

143. Defendants' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiff.

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

WHEREFORE, Plaintiff demands judgment against defendants, jointly and severally, in amounts in excess of $50,000.

Dated: August 17, 2018

_W. Steven Berman_

W. Steven Berman (PA Bar No. 45927)
**NAPOLI SHKOLNIK PLLC**
1 Greentree Centre, Suite 201
10,000 Lincoln Drive
Marlton, NJ 08053
Tel: (212) 397-1000
Fax: 646-846-7603

**CUKER LAW FIRM, LLC**
Mark R. Cuker (PA I.D. 21182)
2005 Market Street, Suite 1120
Philadelphia, PA 19103
Tel: 215-531-8522
Email: Mark@cukerlaw.com

*Attorney for Plaintiff*

22

Case# 2018-20572-0 Docketed at Montgomery County Prothonotary on 08/17/2018 2:47 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## VERIFICATION

Kathleen Kervin hereby states that she is the plaintiff in this action and verifies that the statements made in the foregoing pleading are true and correct to the best of his knowledge, information and belief.  The undersigned understands that the statements therein are made subject to penalties of 18 Pa. C.S.A. Sec. 4904 relating to unsworn falsification to authorities

Kathleen M. Kervin
Kathleen Kervin

Dated: 7/17/18

23

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

KATHLEEN KERVIN

         *Plaintiff,*

    v.

3M COMPANY (f/k/a Minnesota Mining and
Manufacturing, Co), ANGUS FIRE (f/k/a Angus
International), ANSUL (a/k/a Ansul Chemical
Company; a/k/a The Ansul Company a/k/a Ansul
Fire Protection), BUCKEYE FIRE EQUIPMENT
COMPANY, CHEMGUARD, INC., and
NATIONAL FOAM, INC. (a/k/a Chubb National
Foam),

         *Defendants.*

Civil Action No. _____

CONSENT TO NOTICE OF
REMOVAL

JURY TRIAL DEMANDED

### DEFENDANT NATIONAL FOAM, INC'S CONSENT TO NOTICE OF REMOVAL

Defendant, National Foam, Inc., by and through its undersigned counsel, and without

waiving any defenses or objections to which it may be entitled, hereby consents to removal of this

action currently pending in the Court of Common Pleas of Montgomery County, Pennsylvania,

No. 2018-20572, to the United States District Court for the Eastern District of Pennsylvania.

National Foam, Inc. is a Delaware corporation with its principal place of business in North

Carolina.

                        /s/ Keith E. Smith_____
                        Greenberg Traurig, LLC
                        2700 Two Commerce Square
                        2001 Market Street
                        Philadelphia, PA 19103
                        *Counsel for Defendant National Foam, Inc.\*

Dated:  October 9, 2018.

1

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHN ZYSK and COLLEEN ZYSK, h/w : <br> : <br>     Plaintiffs, : <br> : <br>     vs. : <br> : <br> THE 3M COMPANY; TYCO FIRE :: <br> PRODUCTS LP; BUCKEYE FIRE : <br> PROTECTION COMPANY; CHEMGUARD; : <br> and NATIONAL FOAM, INC., : <br> : <br>     Defendants. : <br> : | Civil Action No. 2:18-cv-02036-MSG |

**DECLARATION OF ROBERT F. NELSON IN SUPPORT
OF NATIONAL FOAM, INC.'S OPPOSITION TO
PLAINTIFFS' MOTION TO REMAND**

I, Robert F. Nelson, submit this declaration in support of National Foam, Inc.'s Opposition to Plaintiffs' Motion to Remand this case to state court.

1.    I am the General Manager of National Foam, Inc. ("National Foam"), the most senior position in the United States of any person working for National Foam. I have held this position since 2015, when the corporate headquarters of National Foam moved to Angier, North Carolina. My office and our Vice-President of Finance are located in Angier, North Carolina.

2.    National Foam was incorporated in Delaware on March 19, 2013.  National Foam remains a Delaware corporation with its principal place of business and corporate headquarters in Angier, North Carolina.

3.    Since 2015, meetings of the Board of Directors of National Foam have been held in Angier, North Carolina.

4.    In early 2015, National Foam closed its offices in Exton, Pennsylvania and transferred some of the employees working there to its foam manufacturing facility in nearby

West Chester, Pennsylvania.  For a brief period of time in 2015, National Foam referred to its headquarters as being in West Chester.  The West Chester, Pennsylvania facility, which is currently being marketed for sale, maintains a small staff with one corporate officer resident at that site.

5.     In the Fourth Quarter of 2015, shortly after I was hired as the General Manager, National Foam officially moved its corporate headquarters to Angier, North Carolina.

6.     Also in the Fourth Quarter of 2015, National Foam opened a new firefighting foam manufacturing facility in Angier, North Carolina, dedicated to producing its new C6 foam formulations.  This foam facility is located adjacent to the previously existing National Foam manufacturing facility in Angier, North Carolina that focused on firefighting hoses.  By the end of 2015, all foam manufacturing operations had moved from Pennsylvania to North Carolina and the headquarters of National Foam was officially relocated to Angier, North Carolina.

7.     With the opening of the Angier, North Carolina foam facility, the transition of virtually all of National Foam's operations in the United States to North Carolina was complete. Beginning in late 2015, and continuing until today, North Carolina remains the sole location in the United States where corporate decisions are made and where the activities of National Foam are directed, controlled and coordinated.

8.     I have reviewed the exhibits attached to plaintiffs' motion. These exhibits evidence only that National Foam has been slow to update its website and other information and does not reflect any corporate decision making conducted in Pennsylvania.  In fact, plaintiffs' Exhibits D-F reflect that these gradual changes on the website and in the documents are being made.  National Foam will continue to update other information it publishes to reflect North Carolina as its headquarters.  Of course, the sale of the West Chester facility will expedite

the updating of this information as National Foam will no longer own any facility in Pennsylvania when that sale is completed.

9.      I declare under penalty of perjury pursuant to 28 U.S.C. §1746, that the foregoing is true and correct.

Executed on June 22, 2018.

Robert F. Nelson
General Manager, National Foam, Inc.

# EXHIBIT D

Page 1

1           IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                    -   -   -
3     LEONARD GRANDE,              : Case No.
          Plaintiff,              : 2:18-cv-02041-WG
4                                 :
          vs.                     :
5                                 :
      THE 3M COMPANY (f/k/a        :
6     MINNESOTA MINING AND         :
      MANUFACTURING CO.); TYCO     :
7     FIRE PRODUCTS LP,            :
      successor-in-interest to     :
8     the ANSUL COMPANY;           :
      BUCKEYE FIRE PROTECTION      :
9     COMPANY; CHEMGUARD; and      :
      NATIONAL FOAM, INC.          :
10          Defendants.            :
11                   -   -   -
12                August 28, 2018
13                   -   -   -
14          Oral deposition of National Foam,
15    Inc. taken through Robert F. Nelson, and oral
16    deposition of ROBERT F. NELSON, taken at the
17    offices of Greenberg Traurig, LLP, 2001 Market
18    Street, Suite 2700, Philadelphia, Pennsylvania
19    19103, beginning at 1:50 p.m., before LINDA
20    ROSSI-RIOS, a Federally Approved RPR, CCR and
21    Notary Public.
22                   -   -   -
              VERITEXT LEGAL SOLUTIONS
23               MID-ATLANTIC REGION
           1801 Market Street - Suite 1800
24              Philadelphia, PA  19103

ROBERT F. NELSON

Page 10

1    it.
2         Sometimes counsel asking
3    questions will be looking for a folder or
4    elsewhere and their voices may not be
5    projected properly.  If at any time you don't
6    hear the question, please tell us you don't
7    hear the question.  That may be relevant
8    relevant to any questions that may be asked
9    via telephone.
10        Conversely, sometimes -- all
11   counsel here are trained to project our
12   voices to the rear of the courtroom.
13   Sometimes we get into the habit without even
14   knowing it of projecting our voice and we're
15   too loud.  If that happens, let us know and
16   we'll tone down our volume for you.  It means
17   nothing.  We're not angry or anything.
18   Sometimes we just get into that habit.
19        The court reporter is here to
20   take down verbal answers to the questions
21   asked.  All of the answers need to be verbal.
22   The court reporter will have difficulties
23   with a nod of the head, shrug of the
24   shoulders, indications of distances with your

Page 11

1    hands apart, et cetera.  Also, uh-huh and
2    uh-uh, they're great here today, but in six
3    months when we look at the deposition and we
4    see those answers, we won't know if it was an
5    affirmative answer or a negative answer.
6         In preparing for your
7    deposition, did you read any documents?
8         A.    Yes.
9         Q.    What were they?
10        A.    My declaration and the response
11   from counsel to that motion to remand.  I
12   can't remember exactly the document title.
13        Q.    Anything else?
14        A.    No.  Not as it pertains to
15   this.
16        Q.    When you say this, are you
17   saying your deposition or as the declarant?
18        A.    My declaration and the response
19   from my counsel.
20        Q.    How about the documents
21   produced today, did you review them?
22        A.    I did.
23        Q.    Did you review the deposition
24   notice to National Foam?

Page 12

1         A.    I did.
2         Q.    Did you review the deposition
3    notice to yourself?
4         A.    I did.
5         Q.    For the record, it's National
6    Foam, Inc.  Am I correct?
7         A.    It is.
8         Q.    Thank you.  In preparing for
9    the deposition, did you view any photographs?
10        A.    No.
11        Q.    Did you view any videos?
12        A.    No.
13        Q.    In preparing for this deposition,
14   did you review any websites?
15        A.    No.
16        Q.    Other than counsel, did you
17   speak to anyone regarding the deposition today?
18        A.    Yes.
19        Q.    And to whom?
20        A.    My supervisor.
21        Q.    His name or her name?
22        A.    Paul Williams.
23        Q.    Does he have a title at
24   National Foam, Inc.?

Page 13

1         A.    Chief executive officer.
2         Q.    Anyone else?
3         A.    I also spoke to Nick Brown who
4    is our corporate counsel for Angus International
5    Safety Group.
6         Q.    Anyone else?
7         A.    No.
8         Q.    Can you tell me what you spoke
9    with Mr. Williams regarding?
10        MR. SMITH:  Hold on a second.
11   To the extent he spoke with Mr. Williams
12   and Mr. Brown or Mr. Williams and me
13   and Mr. Brown, that will be covered by
14   attorney-client privilege.
15        MR. FELICIANI:  I'll rephrase
16   the question.
17   BY MR. FELICIANI:
18        Q.    Is Mr. Williams an attorney?
19        A.    Not to my knowledge.
20        Q.    Did you speak to Mr. Williams
21   in the presence of your counsel?
22        A.    By that do you mean Mr. Smith?
23        Q.    Or Mr. Brown.  If there were
24   three of you in the conversation.  I just

4 (Pages 10 - 13)

ROBERT F. NELSON

1 BY MR. FELICIANI:
2     Q.    Are you familiar with -- I'm
3 going to go with this one, with the Angus
4 one.
5     A.    Yes.
6     Q.    Are you familiar with that one?
7     A.    Yes.  The next document is
8 National Foam Organizational Chart.  I am
9 familiar with that document.
10    Q.    Thank you very much.
11    A.    The next document is Press
12 Release, New Foam Manufacturing Facility, I
13 am familiar with that document.
14    Q.    Thank you very much.
15    A.    The next document is Organizational
16 Announcement, 5 July 2016.  I am familiar
17 with that document.
18    Q.    Thank you.  You are also known
19 as Bobby Nelson.  Correct?
20    A.    Correct.
21    Q.    I will be asking some questions
22 on these later, but for right now I'd like to
23 put them aside.
24          Mr. Nelson, can you tell me

1 when you first saw Nelson-2?
2     A.    I don't recall the specific
3 date but sometime last week.
4     Q.    Not to belabor the point, but
5 by whom are you employed?
6     A.    National Foam, Inc.
7     Q.    Is National Foam a privately
8 held corporation?
9     A.    Can you rephrase that?
10    Q.    Sure.  Is it traded on the
11 stock market?
12    A.    It is not.
13    Q.    Could you please state your
14 business address?
15    A.    141 Junny Road, Angier, North
16 Carolina.
17          MR. FELICIANI:  Counsel, I'll
18          agree not to ask Mr. Nelson his home
19          address, but should he leave, I'm
20          assuming you will give me his
21          information?
22          MR. SMITH:  Yes.
23          MR. FELICIANI:  Thank you.
24 BY MR. FELICIANI:

1     Q.    Mr. Nelson, could you please
2 state your current position with National
3 Foam, Inc.?
4     A.    General manager.
5     Q.    How long have you held that
6 position at National Foam, Inc.?
7     A.    Since August of 2015.
8     Q.    Prior to this position, did you
9 hold any other positions at National Foam,
10 Inc.?
11    A.    I did not.
12    Q.    Did you work at any corporation
13 or entity associated with National Foam?
14    A.    I did.
15    Q.    With whom?
16    A.    Could you rephrase the
17 question?
18    Q.    With whom?
19    A.    Are we --
20          MR. SMITH:  I'll object to the
21          form of the question in terms of
22          affiliated with National Foam.
23 BY MR. FELICIANI:
24    Q.    Did you work for Angus?

1     A.    I've worked for Angus Fire
2 Armour Corporation.
3     Q.    What was your position there?
4     A.    I had various positions.
5     Q.    Sometimes people work their way
6 up from the ground up.  Why don't you give me
7 where you started and where you ended.
8     A.    I started as -- in a sales role
9 and I had business development, project
10 management roles while we were known as Angus
11 Fire Armour Corporation.
12    Q.    What is the highest office you
13 received -- strike that.
14          Did you end up as a business
15 development project manager?
16    A.    I don't recall the final title
17 that I had.
18    Q.    How many years did you work at
19 Angus Fire Armour Corporation?
20    A.    I don't recall specifically,
21 but six or seven.
22    Q.    I'm going to go back to
23 National Foam, Inc.  What are your duties as
24 general manager there?

7 (Pages 22 - 25)

ROBERT F. NELSON

1     A.     My duties as general manager
2  are to run the National Foam, Inc. operating
3  company in North America.  In that role, I
4  manage all aspects, all operating aspects of
5  the company.  I'm responsible for the profit
6  and loss of the organization and all
7  strategic decisions.
8     Q.     Anything else?
9     A.     Could you rephrase the
10 question?
11    Q.     Sure.  Are you also responsible
12 for hiring and firing?
13    A.     I am.
14    Q.     Do you oversee accounting?
15    A.     I do.
16    Q.     Speaking of accounting, does
17 National Foam have its own accounting department?
18    A.     It does.
19    Q.     And where is that located?
20    A.     Angier, North Carolina.
21    Q.     Do you oversee purchasing of
22 insurance?
23    A.     I do not.
24    Q.     Can you tell me who does?

1     A.     That responsibility would be
2  with Angus International Safety Group.
3     Q.     Are you the person who makes
4  decisions as to what products are going to be
5  made?
6     A.     I am one of the individuals
7  that would make that decision.
8     Q.     Who else would be involved?
9     A.     It would depend on the product.
10    Q.     Right now you're making C6?
11    A.     Could you rephrase?
12    Q.     Sure.  What products are being
13 made in Angier, North Carolina right now?
14    A.     We manufacture firefighting
15 foam concentrates.
16    Q.     Am I correct that they have
17 different carbon fiber formulas?
18    A.     Each firefighting foam has a
19 unique formulation.
20    Q.     Have you made any decisions
21 related to product development or
22 participated in making any decisions relating
23 to product development relating to
24 firefighting foams made down in North

1  Carolina?
2     A.     Currently, no.
3     Q.     Who are the individuals who had
4  those decisions, made those decisions?
5     A.     Could you rephrase the
6  question?
7     Q.     Sure.  If there's going to be a
8  discussion as to a product that may be made,
9  who would be involved in that discussion?
10    A.     Specifically new product
11 development?
12    Q.     Yes.
13    A.     We have a global product
14 manager for foam and we have an internal new
15 product development process.  And
16 contributing to that would be the global
17 product manager for foam, National Foam
18 chemists, chemists in the UK, and then other
19 corporate staff.
20    Q.     Are any of those chemists
21 located in Pennsylvania?
22    A.     We have a chemist located in
23 Pennsylvania.
24    Q.     And what is his name?

1     A.     It's not a him, it's a her.
2  Her name is Anne Regina.
3     Q.     Is anyone else in Pennsylvania
4  involved in product development?
5     A.     Could you rephrase the
6  question?
7     Q.     Other than Anne Regina, is
8  anyone else in Pennsylvania involved in
9  product development?
10    A.     Yes.
11    Q.     Who would that be?
12    A.     Hank Shaefer.
13    Q.     Anybody else?
14    A.     Not directly.
15    Q.     What is the position of
16 Mr. Shaefer in National Foam?
17    A.     Vice president of engineering.
18    Q.     How long has Mr. Shaefer been
19 vice president of engineering?
20    A.     I don't recall specifically.
21 Just to go back to your previous question, I
22 want to provide some additional clarity.
23 Mr. Shaefer would not contribute --
24 Mr. Shaefer would not be part of the formal

8 (Pages 26 - 29)

ROBERT F. NELSON

1  date on Nelson-10 is February 13, 2017?
2       A.    You are.
3             - - -
4             (Exhibits Nelson-3, Declaration
5       of Robert F. Nelson; Nelson-4, Case
6       Management Track Designation Form,
7       were marked for identification.)
8             - - -
9  BY MR. FELICIANI:
10      Q.    I'd like to move to the
11 declaration sheet which has been marked as
12 Nelson-2. I'm sorry, Nelson-3.
13      A.    I've reviewed Nelson-3.
14      Q.    Mr. Nelson, did you draft Nelson-3?
15      A.    I contributed the draft of
16 Nelson-3.
17      Q.    Who at National Foam, and I
18 don't mean your counsel, other than your
19 counsel let's say, who at National Foam
20 assisted in drafting Nelson-3?
21      A.    I'm aware of Paul Williams
22 helping to draft Nelson-3.
23      Q.    Who is Paul Williams?
24      A.    Chief executive officer.

1       Q.    Where is Mr. Williams' office
2  located?
3       A.    In the United Kingdom.
4             MR. FELICIANI: Counsel, before
5       we move forward, can we stipulate that
6       the exact same document has been filed
7       in all the other cases?
8             MR. SMITH: Substantively, yes.
9  BY MR. FELICIANI:
10      Q.    And in paragraph 2 of Nelson-3,
11 it states, among other things, that the
12 principal place of business and corporate
13 headquarters of National Foam, Inc. is in
14 Angier, North Carolina. Correct?
15      A.    Correct.
16      Q.    Could you, please, tell me what
17 you mean by corporate headquarters?
18      A.    By corporate headquarters, I
19 mean the corporate governance decisions are
20 made in Angier, North Carolina in liaison
21 with my supervisor in the US.
22      Q.    Are any of those corporate
23 decisions ever made in liaison with anyone in
24 West Chester, Pennsylvania?

1       A.    No to the corporate decision,
2  but yes to the discussion from functional
3  groups on their strategies and tactics. So
4  in other words, in terms of the functional
5  groups that sit in West Chester, they can
6  make a recommendation, but that
7  recommendation would come to me and I would
8  gauge and/or approve and/or deny that
9  recommendation. In certain situations I
10 consult my supervisor.
11      Q.    Who is your supervisor?
12      A.    Paul Williams.
13      Q.    Which anticipates my next
14 question. My next question is, the decisions
15 regarding governance, are they ever made
16 between West Chester, Pennsylvania and the
17 UK?
18      A.    Could you repeat that?
19      Q.    I will rephrase. Are you aware
20 of any decisions regarding governance being
21 made between West Chester, Pennsylvania,
22 anyone in West Chester, Pennsylvania and the
23 United Kingdom?
24      A.    I am not aware.

1       Q.    Is that something that you
2  would normally be made aware of?
3       A.    I should be made aware of it,
4  yes.
5       Q.    Should be and always indicate
6  different things.
7       A.    As it pertains to business
8  decisions, investment, new product development,
9  hiring and firing, strategy, sales initiatives,
10 pricing and so on, that would all go through
11 me. What I referenced in my answer was we
12 allow, encourage individuals in all of our
13 businesses to talk to anyone in our business.
14 So that's what I was referencing in my
15 answer.
16      Q.    Are there topics of governance
17 which would be done between West Chester and
18 the UK other than -- that are outside what
19 you do?
20      A.    No.
21      Q.    So that I'm clear, the
22 corporate headquarters, that's where the
23 corporate offices are located?
24      A.    As you describe corporate

ROBERT F. NELSON

Page 66

1   offices, we would take -- we would define it
2   as where the corporate decisions are made.
3   So based on that definition, yes, the
4   corporate offices would be in Angier.
5       Q.    So that anticipated my next
6   question.  That location is where corporate
7   officers direct, control and co-ordinate
8   National Foam's activities?
9       A.    Correct.
10      Q.    That's what you stated in
11  paragraph 7.  Correct?
12      A.    Correct.
13      Q.    Am I correct that in this
14  document, Nelson-3, you state that since 2015
15  the offices in Angier, North Carolina are the
16  main offices of National Foam, Inc.?
17          MR. SMITH:  Where is that?
18          MR. FELICIANI:  Everywhere in
19  this document.
20          MR. SMITH:  You're
21  paraphrasing.
22          MR. FELICIANI:  Paraphrasing,
23  yes.
24          THE WITNESS:  To your adjective

Page 67

1   of main, they're where the corporate
2   governance decisions are made.  I
3   can't comment on the main part.  But,
4   for example, I sit in Angier.  Our
5   finance manager sits in Angier.  Our
6   customer service sits in Angier.  Foam
7   operations sits in Angier.  Invoicing
8   sits in Angier.  That's my interpretation
9   of what you meant by that.
10  BY MR. FELICIANI:
11      Q.    Thank you.  Before we
12  proceed...
13          - - -
14          (Exhibit Nelson-11, Contact
15      list, was marked for identification.)
16          - - -
17  BY MR. FELICIANI:
18      Q.    Let me know when you're done
19  reviewing it, Mr. Nelson.
20      A.    The last two pages are blank.
21  I've finished reviewing Nelson-11.
22      Q.    Am I correct that customer
23  service is listed on the first page of that
24  document?

Page 68

1       A.    Customer service has a notation
2   on the first page of this document.  Correct.
3       Q.    Am I correct that the area code
4   for the customer service document is 610?
5       A.    You are correct.
6       Q.    Am I correct that 610 is a
7   Montgomery County, Reading and Allentown area
8   code?
9       A.    I believe so.
10      Q.    So if somebody has a question
11  for customer service, they would call that
12  number.  Am I correct?
13      A.    We have more than one customer
14  service number.  I can't speak to the dating
15  of this, but depending on the date of this,
16  we may have had customer service sitting in
17  West Chester.  That entire function now sits
18  in Angier.
19      Q.    Could you take a look at the
20  document and see what date it is?
21          MR. SMITH:  The date it was
22      printed off the website?
23          MR. FELICIANI:  Yes.
24          THE WITNESS:  8/28/2018.

Page 69

1   BY MR. FELICIANI:
2       Q.    Can I see Nelson-7, 8 and 9?
3           Could you read the 610 number
4   there for customer service?
5       A.    610.363.1400.
6       Q.    I'd like to show you Nelson-10.
7       A.    I've been shown Nelson-10.
8   Correct.  Same document.
9       Q.    Could you read the telephone
10  number off of that particular document?
11      A.    610.363.1400.
12      Q.    That's the same number.  Am I
13  correct?
14      A.    It is.
15      Q.    I'm going to show you Nelson --
16          MR. SMITH:  I'll stipulate that
17      the phone number on all of those is
18      the same.
19          MR. FELICIANI:  You're going to
20      stipulate that the phone number on
21      Nelson-6, 7, 8 and 9 are all the same
22      number?
23          MR. SMITH:  Yes.
24          THE WITNESS:  Yes.

18 (Pages 66 - 69)

ROBERT F. NELSON

1       MR. SMITH: 6, 7, 8 and 9 is
2   identified as the 24-hour red alert
3   number, but it's all the same on the
4   documents.
5   BY MR. FELICIANI:
6       Q.   Can you state for the record
7   what products are manufactured by National
8   Foam, Inc.?
9       MR. SMITH: I'm going to object
10   to that as not relevant to the issues
11   of the diversity of jurisdiction.
12       MR. FELICIANI: Give me five
13   questions again and we'll see.
14       THE WITNESS: I couldn't give
15   you an exhaustive list, but in the
16   interest of trying to explain what we
17   manufacture, broadly we have two
18   product portfolios, firefighting foam
19   concentrates and systems equipment.
20   Firefighting foam concentrates are
21   class A foam concentrates, class B
22   foam concentrates, flowing free foam
23   concentrates, wetting agents and so
24   on. The system side of our business

1   has a variety of systems equipment
2   that is quite a diverse portfolio, but
3   we manufacture wheeled equipment,
4   trucks, pumps, monitors, fixed
5   firefighting systems, trailers, and
6   hose. That is not an exhaustive list
7   but more of a product portfolio
8   description.
9   BY MR. FELICIANI:
10       Q.   Thank you. I understand.
11       And for the systems equipment,
12   would that also involve Mr. Hank Shaefer?
13       A.   It does.
14       Q.   He is the vice president of
15   engineering?
16       A.   He is.
17       Q.   Is he the head of that department?
18       A.   He is the head of the engineering
19   department.
20       Q.   What other departments are
21   in -- other than engineering, what other
22   departments are in the West Chester location?
23       A.   Supply chain is the only other
24   department in West Chester.

1       Q.   Supply chain would be --
2       A.   Just to clarify -- excuse me
3   for interrupting you. Just to clarify,
4   National Foam on the systems side of our
5   business will source some of our products
6   from our UK sister companies, but the
7   majority of our products are manufactured
8   using third-party partners. From a supply
9   chain standpoint, we have a group that
10   liaises with those third-party manufacturers.
11       Q.   Where is that group located?
12       A.   West Chester.
13       Q.   Who makes the decisions
14   relating to approval of the third-party
15   manufacturers, et cetera?
16       A.   The ultimate decision would be
17   mine in liaison with my supervisor.
18       Q.   Are all the products that we
19   discussed that you just mentioned, are they
20   all manufactured by National Foam, Inc. in
21   Angier, North Carolina?
22       MR. SMITH: Object to the form
23   of the question.
24       THE WITNESS: Are we specifically

1   speaking about the systems part of the
2   business?
3   BY MR. FELICIANI:
4       Q.   We can do that. How about the
5   systems part of the business, is that done in --
6       A.   No, they're not manufactured in
7   Angier.
8       Q.   Where is it manufactured?
9       A.   We have a variety of strategic
10   partners across the country that will manufacture
11   those products for us.
12       Q.   So you just design, they
13   manufacture?
14       A.   Well, we would design, we would
15   engineer, we would test, we would commission,
16   we would train and we would liaise with those
17   strategic partners to make certain that not
18   only are they qualified but they would
19   produce to our specification, manufacture to
20   our specification.
21       Q.   Is any of that done in West
22   Chester, Pennsylvania?
23       A.   No.
24       Q.   I'd like to direct your attention

19 (Pages 70 - 73)

ROBERT F. NELSON

1   in Pennsylvania, not in Angier.
2       Q.   Where are they?
3       A.   Barry Rowswell is in Canada.
4   Steve Cheroke is in Phoenix.  Cheryl Bosin is
5   in Indianapolis.  Bob Tallon is in Dallas.
6   Once again, continuing right, Andy Pisch and
7   Patricia Freeman are in Angier.  Michael
8   Sontag and the five individuals underneath
9   him are in West Chester.  Hank Shaefer and
10   the six individuals under Hank Shaefer in
11   West Chester.  Paul Southwood resides in the
12   UK.  Martin Dowson resides in Canada and
13   Chrissy Root resides in West Chester.
14       Q.   Has Paul Williams ever visited
15   the North Carolina office?
16       A.   Yes, he has.
17       Q.   How frequently does he visit?
18       A.   It depends on the year.
19   Normally between one and three times a year.
20       Q.   Why does he visit?
21       A.   He has operating -- well, he
22   has supervisory responsibility for that
23   location.  And ultimately the National Foam
24   business globally.

1       MS. CHRISTENSEN:  I have no
2   further questions right now.
3            - - -
4       EXAMINATION
5            - - -
6   BY MR. LANCIOTTI:
7       Q.   My name is Patrick Lanciotti.
8   Thank you for your time today.
9       I have two brief questions
10   about one of your employees, Anne Regina.  I
11   believe you testified earlier that she's a
12   chemist located in the West Chester office?
13       A.   She is.
14       Q.   To the extent you know, can you
15   elaborate a little bit about Anne's role in
16   the company as a chemist?
17       A.   Anne is the chemist --
18       MR. SMITH:  Object to the form
19   of the question to the extent it
20   doesn't go to the direction, control
21   of the corporation.  Go ahead.
22       THE WITNESS:  We only have one
23   chemist in North America who reports
24   in through National Foam.  So Anne

1   Regina fills that function.  So she
2   would contribute to research and
3   development, foam chemistry analysis,
4   technical response, sales team
5   support.  She would liaise with
6   quality issues or any manufacturing
7   issues that we might have.  She would
8   be our primary resource for that.
9   BY MR. LANCIOTTI:
10       Q.   Would she be the point of
11   contact for any issues with respect to mil
12   spec applications with the department of
13   defense?
14       MR. SMITH:  Object to the form
15   of the question.  Nothing to do with
16   jurisdiction.
17       MR. LANCIOTTI:  One more
18   question.
19       MR. SMITH:  I'm not letting him
20   answer that question.  That has
21   nothing to do with diversity.
22       MR. LANCIOTTI:  Withdrawn.
23   BY MR. LANCIOTTI:
24       Q.   Is there a reason why the only

1   chemist in North America is located in West
2   Chester when the National Foam manufacturing
3   facility for firefighting foam is in Angier?
4       A.   Well, Anne has been with the
5   organization going on 40 years.  So employees
6   with that tenure we normally are -- we are
7   normally working in conjunction with where
8   they would like to be domiciled.  So she's a
9   resident, I believe, of West Chester and so
10   on.  That's primarily why she sits in West
11   Chester.
12       Q.   Do you supervise Anne Regina?
13       A.   No, I do not.  I don't directly
14   supervisor her.
15       Q.   Who does she answer to?
16       A.   Under the reporting structure,
17   she reports to Hank Shaefer with dotted line
18   to product management in the UK.
19       Q.   Hank is located in the UK?
20       A.   No, Hank is located in West
21   Chester.
22       MR. LANCIOTTI:  Thank you.
23       MR. COHAN:  I have no questions.
24            - - -

27 (Pages 102 - 105)

ROBERT F. NELSON

Page 106

```
1            EXAMINATION
2              - - -
3  BY MR. SMITH:
4     Q.   I have one question.  Who does
5  Hank report to, Hank Shaefer?
6     A.   Myself.  Everyone on that org
7  chart with the exception of Paul Southwood at
8  the top line reports to me.  Paul Southwood
9  has dotted line to me.
10
11          FURTHER EXAMINATION
12             - - -
13  BY MS. CHRISTENSEN:
14     Q.   Who else does Paul Southwood
15  report to?
16     A.   I believe he reports directly
17  to the general manager of the UK or Angus products.
18     Q.   And who would that person be?
19     A.   It's currently Anthony Dimmer.
20          MR. SMITH:  Off the record.
21             - - -
22          (A discussion off the record
23  occurred.)
24             - - -
```

Page 107

```
1          FURTHER EXAMINATION
2              - - -
3  BY MR. FELICIANI:
4     Q.   We're back on the record, Mr.
5  Nelson.  I just have a few other questions to
6  ask you.
7          Did National Foam send any
8  correspondence to any employees of National
9  Foam, Inc. in West Chester advising them that
10  you were closing down that office?
11     A.   Yes.
12     Q.   Can you tell me what was said,
13  or if you don't know, you can just say just
14  correspondence?
15     A.   I believe that Mr. Smith has
16  put in the exhibits copies of some
17  correspondence that went to the employees.
18  Now, just to be clear, I believe this is
19  early in 2015 before I joined the
20  organization, but I believe that there are
21  two exhibits in the packet.
22     Q.   Were there any other documents
23  subsequent to 2000 when you came on board to
24  the personnel at West Chester advising them
```

Page 108

```
1  you were relocating?
2     A.   I'm not aware.
3     Q.   I think you mentioned some
4  people are thinking of relocating their jobs
5  down to Angier.  Is that right?  Did you say
6  that earlier?
7     A.   Could you rephrase?
8     Q.   Are any of the individuals
9  working in West Chester, Pennsylvania, going
10  to be relocating their jobs down to National
11  Foam, Inc. in Angier?
12     A.   None of the current employees
13  have any specific plans to relocate to
14  Angier.
15     Q.   How about Mr. Shaefer?
16     A.   No plans that I'm aware of.
17     Q.   Is he going to remain in the
18  employ of National Foam, Inc.?
19     A.   It's hard for me to speculate,
20  but I would say yes.
21     Q.   Were there any advertisements
22  placed in any trade magazines advising that
23  National Foam was moving its headquarters
24  from West Chester, Pennsylvania to Angier,
```

Page 109

```
1  North Carolina?
2     A.   Not that I'm aware of.
3     Q.   Were there any advertisements
4  in any trade magazines advising that they
5  were -- National Foam, Inc. was closing its
6  West Chester office?
7     A.   No advertisements that I'm
8  aware of.
9     Q.   In any forum, publication?
10     A.   Not that I'm aware of.
11     Q.   Were there ever any
12  instructions to anyone advising that they
13  should change the Material Safety Data Sheet
14  of National Foam, Inc. to reflect the
15  national headquarters was in Angier, North
16  Carolina?
17     A.   I can't answer that question.
18     Q.   Why is that?
19     A.   Well, to be --
20     Q.   Is that because you don't know?
21     A.   I don't know.  Correct.
22     Q.   Am I correct that the National
23  Foam, Inc. facilities in West Chester are for
24  sale currently?
```

28 (Pages 106 - 109)

ROBERT F. NELSON

Page 110

1    A.    Yes.
2    Q.    And who is handling that sale
3    on behalf of National Foam, Inc.?
4         MR. SMITH:  Objection.
5         THE WITNESS:  Paul Williams.
6    BY MR. FELICIANI:
7    Q.    Can you tell me who signed the
8    contract on behalf of National Foam, Inc.?
9    A.    Which contract?
10   Q.    The contract for sale.
11        MR. SMITH:  Object to the form
12   of the question.
13        THE WITNESS:  I don't know the
14   answer to the question.
15   BY MR. FELICIANI:
16   Q.    Relating to financing loans,
17   lines of credits, et cetera, are you the
18   personal who has the end result in making
19   determinations as to whether or not to enter
20   into the agreement?
21   A.    No.
22   Q.    Who is?
23   A.    That would be done out of the
24   UK.

Page 111

1    Q.    Regarding purchases in excess
2    of $100,000 of either real estate or personal
3    property, who would be in charge of making
4    that decision or approving it?
5    A.    Real estate would be the UK.
6    When you say personal property, you're
7    talking about the acquisition of an asset,
8    company asset?
9    Q.    Yes.
10   A.    We normally call that capital
11   investment or asset purchase and that would
12   have to come out of the UK.
13   Q.    Relating to contracts that are
14   with third parties as we discussed earlier,
15   who enters into those contracts?
16   A.    It depends on the value.  But
17   our normal procedure is that any binding
18   contractual agreements be reviewed in the UK.
19   Q.    Does anyone in the West Chester
20   office have authority to enter into a binding
21   contract?
22   A.    I would say the answer to that
23   would be no.  Do they sign -- it is possible
24   they sign maintenance contracts for their

Page 112

1    boiler or their air conditioner, cleaning
2    services, things like that.
3         MR. FELICIANI:  Give us a
4    minute.
5              - - -
6         (A recess was taken from 5:00
7    p.m. to 5:07 p.m.)
8              - - -
9         MR. FELICIANI:  Mr. Nelson,
10   thank you very much.  We have no
11   further questions.  And I thank
12   Mr. Smith for his generous
13   hospitality.
14        MR. SMITH:  I want to clarify a
15   point at the end there with regard to
16   the contracts that you were asking
17   about and Mr. Nelson testified they
18   were reviewed in the UK.
19             - - -
20        FURTHER EXAMINATION
21             - - -
22   BY MR. SMITH:
23   Q.    Mr. Nelson, who are you
24   referring to in the UK that would have

Page 113

1    reviewed contracts that would bind National
2    Foam, Inc.?
3    A.    At a minimum, Paul Williams.
4    Potentially corporate counsel and chief
5    financial officer Andy Leitch.  Anybody that
6    binds the company contractually would be
7    reviewed and signed by them.  I wasn't very
8    clear on that during my answer.
9              - - -
10        FURTHER EXAMINATION
11             - - -
12   BY MR. FELICIANI:
13   Q.    That just throws the bucket in
14   my direction.  Chief financial officer of
15   which corporation?
16   A.    Angus International Safety
17   Group.
18        MR. FELICIANI:  Thank you.
19        MR. SMITH:  Can we mark my
20   letter of August 27, 2018, in response
21   to the Notice of Deposition as Exhibit
22   13.
23        MR. FELICIANI:  No objection.
24             - - -

29 (Pages 110 - 113)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| LEONARD GRANDE | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Civil Action No. 2:18-cv-02041-WB |
| | : | |
| THE 3M COMPANY; TYCO FIRE | : | |
| PRODUCTS LP; BUCKEYE FIRE | : | |
| PROTECTION COMPANY; CHEMGUARD; | : | |
| and NATIONAL FOAM, INC., | : | |
| | : | |
| Defendants. | : | |

---

### DECLARATION OF ROBERT F. NELSON IN SUPPORT
### OF NATIONAL FOAM, INC.'S OPPOSITION TO
### PLAINTIFF'S MOTION TO REMAND

I, Robert F. Nelson, submit this declaration in support of National Foam, Inc.'s Opposition to Plaintiff's Motion to Remand this case to state court.

1.     I am the General Manager of National Foam, Inc. ("National Foam"), the most senior position in the United States of any person working for National Foam. I have held this position since 2015, when the corporate headquarters of National Foam moved to Angier, North Carolina. My office and our Vice-President of Finance are located in Angier, North Carolina.

2.     National Foam was incorporated in Delaware on March 19, 2013. National Foam remains a Delaware corporation with its principal place of business and corporate headquarters in Angier, North Carolina.

3.     Since 2015, meetings of the Board of Directors of National Foam have been held in Angier, North Carolina.

4.     In early 2015, National Foam closed its offices in Exton, Pennsylvania and transferred some of the employees working there to its foam manufacturing facility in nearby



West Chester, Pennsylvania. For a brief period of time in 2015, National Foam referred to its headquarters as being in West Chester. The West Chester, Pennsylvania facility, which is currently being marketed for sale, maintains a small staff with one corporate officer resident at that site.

5.      In the Fourth Quarter of 2015, shortly after I was hired as the General Manager, National Foam officially moved its corporate headquarters to Angier, North Carolina.

6.  '    Also in the Fourth Quarter of 2015, National Foam opened a new firefighting foam manufacturing facility in Angier, North Carolina, dedicated to producing its new C6 foam formulations. This foam facility is located adjacent to the previously existing National Foam manufacturing facility in Angier, North Carolina that focused on firefighting hoses. By the end of 2015, all foam manufacturing operations had moved from Pennsylvania to North Carolina and the headquarters of National Foam was officially relocated to Angier, North Carolina.

7.      With the opening of the Angier, North Carolina foam facility, the transition of virtually all of National Foam's operations in the United States to North Carolina was complete. Beginning in late 2015, and continuing until today, North Carolina remains the sole location in the United States where corporate decisions are made and where the activities of National Foam are directed, controlled and coordinated.

8.      I have reviewed the exhibits attached to plaintiff's motion. These exhibits evidence only that National Foam has been slow to update its website and other information and does not reflect any corporate decision making conducted in Pennsylvania. In fact, plaintiff's Exhibits D-F reflect that these gradual changes on the website and in the documents are being made. National Foam will continue to update other information it publishes to reflect North Carolina as its headquarters. Of course, the sale of the West Chester facility will expedite

the updating of this information as National Foam will no longer own any facility in Pennsylvania when that sale is completed.

9.   I declare under penalty of perjury pursuant to 28 U.S.C. §1746, that the foregoing is true and correct.

Executed on June 22, 2018.

Robert F. Nelson
General Manager, National Foam, Inc.

# Delaware

Page 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF AMENDMENT OF "EUROSTAR US TRADECO INC.", CHANGING ITS NAME FROM "EUROSTAR US TRADECO INC." TO "NATIONAL FOAM, INC.", FILED IN THIS OFFICE ON THE THIRD DAY OF JULY, A.D. 2013, AT 5 O`CLOCK P.M.



Jeffrey W. Bullock, Secretary of State



5305356  8100
SR# 20161304585

Authentication: 201903020
Date: 02-29-16

You may verify this certificate online at corp.delaware.gov/authver.shtml

## NATIONAL FOAM, INC.

## UNANIMOUS WRITTEN CONSENT OF DIRECTORS

### June 7ᵗʰ, 2016

**THE UNDERSIGNED**, being the members of the Board of Directors (the "**Board**") of National Foam, Inc., a Delaware corporation (the "**Corporation**"), do hereby adopt the following resolutions by unanimous written consent as authorized by the Bylaws of the Corporation and applicable law.

**Appointment of Director to Fill Vacancy**

**WHEREAS**, Article II, Section 2.3 of the Bylaws of the Corporation provides that newly created directorships resulting from any increase in the authorized number of directors or any vacancies in the Board of Directors resulting from death, resignation, retirement, disqualification or other cause (other than removal from office by a vote of the stockholders) may be filled by a majority vote of the directors then in office.

**WHEREAS**, Jason Chautin has resigned as a director of the Corporation (the "**Resignation**"); and

**WHEREAS**, the Board desires to fill the vacancy on the Board created as a result of the Resignation and to fix the number of directors of the corporation at four (4).

**NOW, THEREFORE, BE IT RESOLVED**, that after giving effect to the increased number of directors and the Resignation, the Board deems it to be advisable and in the best interests of the Corporation to elect Hank Shaefer and Robert F. Nelson as directors of the Corporation to serve until his successor is duly elected and qualified (or until the earlier of his death, resignation or removal).

**FURTHER RESOLVED**, effective as of the date hereof, the Board consists of:

Paul Williams
Russell Furtick
Hank Shaefer
and
Robert F. Nelson

**Election of Officers**

**WHEREAS**, the Board deems it to be advisable and in the best interests of the Corporation to remove Jason Chautin as an officer of the Corporation; and

**WHEREAS**, after giving effect to such removal, the Board deems it to be advisable and in the best interests of the Corporation to confirm and elect the officers of the Corporation.

**FURTHER RESOLVED**, that Jason Chautin be, and hereby is, removed as an officer of the Corporation.

**FURTHER RESOLVED**, that, each of the following persons be, and hereby are, confirmed and elected as officers of the Corporation, in the positions identified below, to serve until their successors shall be duly elected and qualified (or until the earlier of their death, resignation or removal):

| Name | Office(s) |
|---|---|
| Paul Williams | President and Chief Executive Officer |
| Robert F. Nelson | General Manager |
| Russell Furtick | VP Operations |
| Hank Shaefer | Senior Vice President of Systems Engineering |

<u>General</u>

**FURTHER RESOLVED**, that all actions previously taken or to be taken by any of the directors or officers of the Corporation or by any of its agents or representatives in connection with the above resolutions are hereby ratified, confirmed and adopted.

*[Signatures appear on following page]*

2

EAST\124814071.1 5/26/16
383984-000001

**IN WITNESS WHEREOF**, the undersigned have executed this Written Consent of Directors as of the day and year first above written. This Written Consent of Directors may be executed and delivered via facsimile or electronic transmission, and shall be deemed an original. This Written Consent of Directors may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

_____
Paul Williams

_____
Russell Furtick